W. C. MORRISON v. B. F. CORNELIUS and others.

Where the defendants, who were engaged in the manufacture of saltpetre·
up to the 14th of April 1865, at the discontinuance of their operations,
left some of the liquid of which saltpetre is made, in troughs and hogs--
heads, covered with boards, and enclosed by a sufficient fence, and three
months thereafter the plaintiff's cattle wandered into the enclosure,
drank of the liquid, and died from the effects thereof, *Held*, that the,
question of *negligence* on the part of the defendants, did not arise.

If a party injured have *contributed* to the injury, he cannot recover damages,
on account of it.

The act of May 26th 1864, by which persons "*while engaged* in the manu-
facture of saltpetre" are required "to enclose their works with a good
and lawful fence," under penalty of double the value of all cattle that are
destroyed by the liquid saltpetre, does not apply after the operations are
discontinued.

Where *both parties* to a case appeal, the Clerks of the Superior Courts
should make out two transcripts, the double appeal constituting in the
Supreme Court *two cases*.

(*Laws* v. *N. C. R. R. Co.*, 7 Jon. 468; *Devereux* v. *Burgwyn*, 11 Ire. 490, cited
and approved.)

CASE, tried before *Mitchell, J.*, at Fall Term 1868 of the·
Superior Court of IREDELL.

The plaintiff declared in two counts. In one, that the·
defendants knowingly left exposed a poisonous substance at a
place about which plaintiff's cattle and other cattle were used
to range; and that the defendants failed to debar cattle from

it by a sufficient fence or other barrier, and that plaintiff's cattle partook of the poisonous substance, and died. In this count he claimed the value of the cattle in damages.

In the second count he demanded double damages, for that the defendants did not guard said poisonous substance against the access of the cattle, as required by the act entitled, "An act to protect cattle, by a good and lawful fence," ratified May 26th 1864.

The defendants, as co-partners, were engaged in the manufacture of saltpetre on the lands of the defendant B. F. Cornelius, near the land of the plaintiff, for six months immediately preceding April 14th 1865. Upon the approach of Gen. Stoneman's army at that date, they discontinued the manufacture, and never afterwards resumed it. About two weeks after the discontinuance, the defendants Cornelius and Morris, removed to the house of the former the kettles and other apparatus used in the manufacture, except two troughs used in the process of evaporation, and two hogsheads, open at top and about four feet high, which were left on the lot, and remained there until after the cattle died. The hogsheads and troughs contained a liquid, of which saltpetre is made by evaporation, and some of this liquid was found therein when the cattle were discovered dead. The quantity in the hogsheads, and its accessibility to cattle, were points in controversy, upon which both sides introduced evidence. Testimony was offered to show that when the defendants removed the kettles, they covered the troughs; and on the other hand, that when the dead cattle were found, the boards had been displaced, and very little of the liquid was remaining.

The cattle, seven in number, were found dead on the 24th of July ensuing, and all, except one which was forty yards distant, were found within the enclosure and within a few yards of the hogsheads and troughs.

The evidence showed that the fence around the lot was not generally five feet high, but had successfully excluded cattle until the abandonment of the work on the 14th of April. There was conflicting testimony as to the condition of the

fence from that time until the death of the cattle. Evidence of physicians and others, was given as to the nature and poisonous effects of the liquid in the hogsheads and troughs.

His Honor charged the jury that the plaintiff was not entitled to recover double damages for the loss of his cattle, under the act of May 26th, 1864, but that, if they found that the liquid left by the defendants in the troughs and hogsheads was poisonous and fatal to cattle, that the defendants knew or had good reason to suppose that it was, that the cattle had access to it from the want of a fence or barriers that would ordinarily exclude cattle, and that the cattle had drunk the poisonous liqnid, and had died from the effects thereof, the plaintiff was entitled to recover damages to the value of the cattle.

The counsel for the plaintiff, and for the defendants, each excepted; Exceptions overruled; Verdict and judgment for the plaintiff accordingly. Appeals prayed and allowed for both parties.

*Bragg*, for the plaintiff.

*W. P. Caldwell*, for the defendants.

DICK, J. The maxim, *sic utere tuo ut alienum non laedas*, has existed in the law for centuries. It has justly been regarded as one of the golden rules of jurisprudence; but the difficulty of its application to particular cases, has given rise to much discussion and numerous adjudications, both in this country and in England. We have examined with care some of the leading American and English authorities, and in the midst of various conflicting views, we think they establish some general uniform rules on the subject. We shall only refer to those which are applicable to the case before us.

In all cases where a person, in the lawful use of his own property, causes injury to another, the party injured, before he can recover damages at law, must show that he has exercised proper care, and is free from blame in regard to the matter. If it appears that the party injured has, by any act of omission

or commission on his part, contributed to the injury complained of, it is generally *damnum absque injuria.* There are some exceptional cases to this general rule, but they are founded upon particular circumstances. *Lynch* v. *Nurdin,* 1 Ad. & E. (N. S.) 422. *Birge* v. *Gardner,* 19 Conn. 507.

If a person enters upon the lands of another to use the premises for his own benefit, under a license given by the owner, or in the enjoyment of a privilege allowed by law, he takes such benefit with all the risks and perils attendant upon it; and if he has full opportunity of inspecting the premises, and there is no concealed cause of mischief, and any existing source of danger is apparent, the owner is in no way responsible for any injury which such license may accidentally sustain. *Indemaur* v. *Dames,* 1 C. C. P. 272; *Hunsell* v. *Smyth,* 97 E. C. L. R. 271; *Butterfield* v. *Forrester,* 11 East, 60; *Bush* v. *Brainard,* 1 Cowen 78.

It is also well settled that an owner of land may on his own premises dig a well, or pit, or ditch, or do any other lawful act in the enjoyment of his property, and he is not liable for consequential injuries to his neighbor's cattle, although these causes of danger are unenclosed and unprotected. If he does such acts with an intent to cause mischief, and he uses inducements to produce such results, of course he is liable for consequent damages.

If he places such causes of danger near a public highway, and does not take the necessary precautions to prevent damage, they constitute a public nuisance, and he is liable for consequences, and also to an indictment. But when a person merely allows a cause of damage to exist on his own premises, which does not amount to a public nuisance, and a licensee or trespasser sustains injury, he has no cause of action against the owner, and the question of negligence does not arise. Damages arise in such cases from what may be styled *permissive causes* of injury, such as leaving a well, or pit, or ditch unprotected and unguarded. If an owner, even on his own premises, gives rise to an *active cause* of injury, he is required to use ordinary care to prevent damage; as, for instance, if he puts fire into

his own woods, he must take reasonable precaution to prevent it from spreading into the lands of his neighbors. These distinctions are illustrated in cases involving the responsibility of Rail Road Companies.

A Rail Road Company is not responsible for the value of a cow that is killed by falling down an embankment, or into a cut or cattle-guard; but is responsible, if the cow is killed by negligence in running the train. This *active cause* of injury is so constant and wide-extended in its consequences, that the Legislature of this State, by statute, has imposed a *prima facie* responsibility on Rail Road Companies in all cases of killing stock. The statute affords a just protection to the owners of stock, as it is very difficult for them to prove the circumstances of the injury, and it is not a hardship on the Companies, as their agents are always present when the act of killing is done, and if due care was used, it can be proved.

Let us now apply these general principles to the case before us, so as to ascertain the rights and liabilities of the parties. The defendants, on their own land, had been engaged in the lawful business of manufacturing saltpetre. While so engaged, they kept a good fence around their works, as was required by the act ratified May 26th 1864; and no damage was sustained by any one.

In April 1865, the United States' forces came into the county, and the defendants ceased their operations, and never resumed them, as the war closed in a short time. When the business was discontinued, the defendants left there some troughs and two hogsheads, containing a poisonous liquid, which had been used in the manufacture of saltpetre. At that time the premises were enclosed, and the troughs, which contained but little of the liquid, were covered with plank. The hogsheads were four feet high, and it was scarcely possible for cattle to be able to drink the poisonous liquid within, as the hogsheads were not full. On the 24th of July,—more than three months after the said works were abandoned,—the cattle of the plaintiff were found dead within and around the enclosure. . These were substantially the facts proved on the

trial, and as the question of negligence is a legal one, we think his Honor erred in not telling the jury, that upon such a state of facts, the question of negligence did not arise, and the plaintiff was not entitled to recover even upon the first count of his declaration.

If the question of negligence could properly arise in this case, we think that much might be said in behalf of the defendants, for a mere omission of duty. In the Spring of 1865, the whole country was filled with alarm and confusion, produced by the closing scenes and events of a great civil war. When the minds of all men were full of fearful apprehensions for the safety of their lives, property and families, we think the defendants ought not to be held to a strict accountability for failing to empty two hogsheads of liquid *saltspetre*, which might possibly kill their neighbors' cattle.

Let us see if the plaintiff was guilty of no act of omission or commission, which contributed to his misfortune. He was a near neighbor of the defendants, and lived near the saltpetre works. He knew that the business was discontinued, and must have known that the troughs and hogsheads were in the enclosure. The public law above referred to must have advised him that the manufacture of saltpetre was a dangerous business to cattle. His cattle were pasturing on the common, and ordinary prudence ought to have prompted him to keep an eye on the enclosure of the saltpetre works. The defendants were not required to keep up the enclosure, except while engaged in their operations. The plaintiff's cattle were trespassing on the lands of the defendants, at the time they were killed. In this State the owners of cattle are not required to keep them enclosed, to prevent them from trespassing on the lands of neighbors. *Laws* v. *N. C. R. R. Co.*, 7 Jon. 468. This, however, is not a right, but a mere immunity given by law. The owner is not liable in damages for a trespass by his cattle upon unenclosed lands, but he takes this legal license with all attendant risks and perils. This privilege is similar to *common because of vicinage* in England. " It is a

trespass, but the law winks at the trespass." 2 Blackstone, 34. The owner of land may at any time drive away cattle from his common, and he is in no way bound to guard them from accidents. *Knight* v. *Abert,* 6 Burr. 472.

The second count in the plaintiff's declaration was for double the value of his cattle, under the Act of 1864 above referred to. This is a highly penal statute, and must be strictly construed. The defendants, by said Act, were required " to enclose their works with a good and lawful fence, while engaged in the manufacture of saltpetre." The 'cattle were killed after the defendants had discontinued their operations, and his Honor was right in instructing the jury that the' plaintiff was not entitled to recover upon this count.

The judgment must be affirmed, so far as it is appealed from by the plaintiff, and the judgment appealed from by the defendant must be reversed, and a *venire de novo* awarded.

As appeals by both parties often produce difficulties as to costs, we think it proper to restate a. rule of this Court, established in the case of *Devereux* v. *Burgwyn,* 11 Ired. 490. To prevent difficulties as to costs, and to prevent cases from being made too complicated, the clerks of the Superior Courts will in future, when both parties appeal, make out two transcripts, so as to make, as there really are, two cases in this Court. In this case, the clerk of this Court, will state two cases on his docket, and charge costs against the plaintiff, in each case.

Per Curiam.                                    *Venire de novo.*