# UNION PACIFIC RAILWAY COMPANY *v.* McDONALD.

**ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.**

No. 224. Argued January 23, 1894. — Decided March 5, 1894.

A railway company which operated a coal mine near one of its stations in Colorado, was in the habit of depositing the slack on an open lot between the mine and the station in such quantities that the slack took fire and was in a permanent state of combustion. This fact had been well known for a long time to the employés and servants of the company, but no fence was erected about the open lot, and no efforts were made to warn people of the danger. A lad 12 years of age and his mother arrived by train at the station and descended there. Neither had any knowledge of the condition of the slack, which, on its surface, presented no sign of danger. Something having alarmed the boy, he ran towards the slack, fell on and into it, and was badly burned. Suit was brought to recover damages from the railway company for the injuries thus inflicted upon him. *Held,*

(1) That the company was guilty of negligence, in view of the statutory obligation to fence;

(2) That the lad was not a trespasser, under the circumstances, and had not been guilty of contributory negligence;

(3) That the case was within the rule that the court may withdraw a case from the jury altogether and direct a verdict, when the evidence is undisputed, or is of such conclusive character that the court would be compelled to set aside a verdict returned in opposition to it.

THE case is stated in the opinion.

*Mr. Samuel Shellabarger* and *Mr. A. A. Hoeling, Jr.,* (with whom were *Mr. John F. Dillon* and *Mr. J. M. Wilson* on the brief,) for plaintiff in error.

*Mr. J. Warner Mills* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

The Union Pacific Railroad Company seeks the reversal of the judgment below for the sum of $7500, the amount assessed against it, by the verdict of a jury, as compensation to the

defendant in error for personal injuries alleged to have been sustained by him in consequence of the want of due care upon the part of the company in managing and controlling certain premises belonging to it, on which the plaintiff received such injuries.

The evidence, on behalf of the plaintiff, tended to establish the following facts: At the time and before the injuries in question were received the defendant owned and operated a railroad, immediately on the line of which was the village of Erie, Colorado, containing about six hundred inhabitants. Within a few hundred feet of its depot at that village the company operated a coal mine. Between the shaft-house of the mine and the depot building were the tracks of the railroad. A narrow, rough, uneven foot-path to the coal mine extended from the depot building, over the railroad tracks, and close to a slack pit or trench. In working the mine, the company's agents and employés had deposited along and close by the track, between the shaft-house of the coal mine and the depot building, a very large quantity of coal slack, which extended up and down the track. The slack was piled up so as to generate heat and cause it to take fire underneath by spontaneous combustion, and was not spread out in thin layers upon the surface of the ground. It was in a long trench formed on the east side of the railroad in excavating and throwing up dirt for the track, and the top of which was on a level with the ground around it. The path, above referred to, was described by a witness as "a little bit above the fire, sort of rim running around the fire, about eighteen inches wide."

For a long time prior to the injuries complained of this slack burned continuously under its surface. A few inches below the surface was a bed of burning coals, extending nearly the whole length of the pit. The surface was a mere covering of ashes, sufficient in depth to conceal from view the fire underneath. Except when there was rain, snow, or wind, no smoke would be emitted from the slack pit, nor would there be any visible indications of the existence of the burning coals under the ashes covering the slack.

The burning portion of the slack, thus concealed and covered by what appeared to be dead ashes, was within two or three hundred yards of the most populous part of the town, and came within a few feet of the platform of the depot building. In 1884 the fire burned within twenty feet of the depot building.

For some time, perhaps as long as two years, before the day on which the plaintiff was injured, the company's agents and officers had knowledge of the existence of this slack pit, and of its dangerous condition as above stated. Cattle had been known to stray into it and get burnt. This fact was known to the company's agents.

The children of the miners were accustomed to go to the mine just as it suited them. They were allowed to pick up coal and carry it to their homes. A witness, who was a coal miner and had worked on this mine, testified that "he had frequently, nearly every day, seen children play around there, and they were allowed to go around the machinery where the shaft was; and this was allowed during all the years this mine was operated. During the time he worked there, he never heard of any objections to children coming on the premises, or of their being driven off." Another witness who had worked in the mine in 1884, and had been acquainted with it before and after that time, and who was asked to state what he knew about strangers, men and women, being allowed to go about the mine, said: "Well, in general, strangers coming to the town, about the first look they take is over to the mine and engine; they are so near the town, and for curiosity they often walk over; never heard of anybody, children or others, being driven away from the works; the slack pile was covered with ashes and the fire could not be seen; the path was about 18 inches wide and near the level of the trench; it was rough and slanting down toward the fire." On cross-examination this witness stated that "the pile had been burning in that way for about two or three years, and the path above it could not be easily seen; that while you would undoubtedly see it, still a person could not follow it clearly, plainly, and easily, and ladies going to the graveyard would avoid it and did not

want to travel it; when on the path the heat from the burning slack could be felt only when the wind blew; the defendants used to dump their fine slack in there from time to time and burn it, and continued to burn it in that way."

The slack pit had no fence around it, nor was it guarded in any way. There was nothing in its appearance, when the weather was clear, to indicate that there was fire beneath the surface of ashes.

On the 3d of September, 1884, the plaintiff, a lad about 12 years of age, visited Erie with his mother. Neither the mother nor the child had any knowledge of this slack pit. After dinner of that day, in the afternoon, the plaintiff obtained the consent of his mother to visit the coal mine in company with a "trapper" boy of the town, with whom he had become acquainted. While at or near the shaft-house his attention was attracted to a man in the act of sending a pair of mules down the shaft. About that time five or six boys came from the coal pit, having lamps on their hats, and dirty faces. One of them yelled, "Let's grease him," another, "Let's burn him." They started towards the plaintiff, who, becoming frightened, ran away, intending to take the small path that skirted the slack pit, the only one leading from the mouth of the coal pit or from the shaft-house to the depot building and the village. In attempting to pass some persons who happened to be on the bank or near the edge of the slack pit, he slipped and fell into the burning slack, breaking through the covering of ashes. He came very near sinking with his entire body into the bed of fire underneath the ashes, and would have perished instantly, if he had not been pulled out by a grown person near by at the time.

The person who rescued him testified that the day was a nice, calm one; that he, witness, started for his home, and hearing some one screaming, he saw the boy fall into the burning slack while running from the trappers who had scared him. "These trappers," the witness said, "were boys down in the mine for the purpose of leading the mules. The boy, George McDonald, was running in the direction of the path that led to the town. He ran into the fire, and fell onto his hands and

face. He [witness] was standing about four feet off from him in the foot-path. He went in and pulled him out, and found his hands all burned, skin hanging from the hands and fingers, and was burned in his back and clothes; that he helped carry him to the hotel, the boy not being able to walk; that at the time of the accident there was nothing to indicate that there was any fire there; that a man who had never seen it would walk right in it; would not know there was any fire, nothing but brown ashes; came up within forty feet of the depot. Children used to go around there at all hours of the day; some to get coal, others to bring their fathers' dinner, and some would go over just to see the place, and this condition of affairs was so allowed or conducted during all the time witness was there; that the path was up and down and on a slant toward the slack pile. The Jackson, Marfell & Mitchell mines used to throw their slack out, but they used to scatter it so it would not burn." On cross-examination the same witness stated that the path was used by the miners in going to and from town to the shaft, and that there was no other path; that when the boy fell into the fire he was running toward the town.

As the result of the injuries received by him, the plaintiff's hands and arms became weakened and in part disabled, and his face badly scarred and disfigured. His general health was greatly and permanently impaired. His kidneys became seriously weakened and diseased. He suffered intense pain, and was confined to his bed for a long period of time, disabled in the use of his hands in any way.

At the time the plaintiff was injured there was in force a statute of Colorado, passed May 3, 1877, entitled "An act to compel owners of coal mines to fence their slack piles and abandoned pits." That statute was as follows: "§ 1. That the owner and operators of coal mines from which fine or slack coal is taken and piled upon the surface of the ground, in such quantities as to produce spontaneous combustion, shall fence said ground in such manner as to prevent loose cattle or horses from having access to such slack piles. § 2. All owners of lands having abandoned coal pits or shafts on the same, of

sufficient depth to endanger the life of cattle, horses, or other stock, shall fence or fill said pits or shafts in such a manner as to afford permanent protection to all such stock endangered thereby. § 3. Every person violating sections one (1) and two (2) of this act shall be deemed guilty of a misdemeanor and shall be fined in a sum not less than twenty (20) dollars nor more than one hundred (100) dollars, to be collected as other fines are collected, and shall be further liable to any party injured thereby in the amount of the actual injury sustained." Gen. Laws Colorado, 1877, p. 126, §§ 137, 138, 139; Mills' Annotated Stats. §§ 3202, 3203, 3204.

The defendant examined two witnesses. Neither of them testified to any material facts inconsistent with those above stated. They were introduced for a purpose to which we shall presently refer.

At the close of all the testimony the defendant asked the court to instruct the jury " that there is not sufficient evidence to warrant the jury in finding that the plaintiff has received any permanent injuries or impairment of his capacity to earn wages, and that because such serious injuries, if any, are not shown to have followed after the other is not sufficient to warrant the jury in finding that the one is the cause of the other."

The court, in its charge to the jury reviewed the evidence, and said : "It is not claimed the plaintiff had any notice or knowledge of the fact that there was any fire in the place where he received his injury, or that by the exercise of reasonable care and diligence he could have seen or discovered the fire. The law made it the duty of the defendant to fence its slack pit, and if it did not do so, and as a result of its negligence in failing to comply with its legal duty in this regard the plaintiff received the injuries complained of, the defendant is liable. Persons are entitled to the protection which would accrue from a compliance with the statute, and the plaintiff had a right to presume the space between the railroad tracks was not a burning slack pit because it was not fenced. It was the legal duty of the defendant to fence the burning slack, and its omission to do so was negligence.

The defendant being guilty of negligence, your next inquiry will be whether the plaintiff was guilty of any such negligence as will prevent him from recovering, for it is a principle of law that one injured by the negligence of another cannot recover damages for such injury if by his own negligence he contributed to the injury.  Upon the undisputed facts of the case it was not an act of negligence for the plaintiff to visit the defendant's coal mine as he did, and he was not a trespasser there in a sense that would excuse the defendant for the acts of negligence by which he was injured, and which I have heretofore adverted to; nor was it an act of negligence for the plaintiff under the circumstances to run away from the miners.  A boy may lawfully run to avoid injury or when frightened or in play; and the fact that the plaintiff was running on the occasion of his injury does not constitute negligence on his part.  He undoubtedly had a right to run toward the hotel where his mother was stopping.  Nor was it negligence in him when he did run not to follow exactly a rough, irregular, and narrow path leading from one railroad track to the other.  There was nothing in the surroundings to inform him, or any other person having no previous knowledge of the facts, that he would incur any risk or danger in not keeping in the path in crossing the space between the railroad tracks, and if you find he did not see the fire and could not, with the exercise of reasonable diligence, discover it, and did not know it was there, and that the surface of the pit apparently presented a safe footing and passage, then he was not guilty of any negligence in attempting to run across it.  The disputed issue in the case is the question of damages; what damages you shall award; and first, gentlemen, you will compensate the plaintiff for the pain and suffering he endured by reason of the injuries he received on this occasion."

After instructing the jury in respect to the measure of damages, the court said: "The plaintiff's attorney has said to you, gentlemen, that he claimed, and that you ought to award, more than a compensation.  He is not content with compensatory damages — that is, the damages you shall find

and award to him for his pain and his suffering, for his expenses, for his loss of time, for the disability that he sustained, if any. He says those are not elements enough, and that, in addition, you should award him damages as a punishment to this defendant for not having complied with the statute. That you cannot do, gentlemen. That claim is not supported by the law. It is, moreover, in the very teeth of the statute of the State under which it is claimed, for that statute in terms says that the persons or the corporation neglecting to fence these slack pits shall be liable to any party injured thereby in the amount of the actual injury sustained, thus in terms cutting off exemplary damages."

The defendant excepted " to the refusal of the court to instruct that there was not sufficient evidence as to the question of serious or permanent injury, and leaving the question of serious impairment to them, and also to the instruction not given, and to the giving of the instruction as to all questions connected with permanent injury, and to the withdrawing the question of negligence of defendant and contributory negligence of the plaintiff from the jury." 35 Fed. Rep. 38.

Before examining the grounds of defendant's exceptions to the action of the court below in giving and refusing instructions, we will consider the general question presented by the case, namely, whether the owner or occupant of premises is liable, under any circumstances, and, if so, under what circumstances, for injuries received by a person while on such premises, and by reason of their dangerous condition.

In *Bennett* v. *Railroad Company*, 102 U. S. 577, 580, it was said that " the owner or occupant of land who, by invitation, express or implied, induces or leads others to come upon his premises, for any lawful purpose, is liable in damages to such persons — they using due care — for injuries occasioned by the unsafe condition of the land or its approaches, if such condition was known to him and not to them, and was negligently suffered to exist, without timely notice to the public, or those who were likely to act upon such invitation." This rule, the court said, was founded in justice and necessity, and was illustrated by many cases.

In the present case there was no express invitation to the plaintiff to come upon the premises of the railroad company for any purpose. But if the company left its slack pit without a fence around it, or anything to give warning of its really dangerous condition, and knew or had reason to believe that it was in a place where it would attract the interest or curiosity of passers-by, can the plaintiff, a boy of tender years, be regarded as a mere trespasser, for whose safety and protection while on the premises in question, against the unseen danger referred to, the railroad company was under no duty or obligation whatever to make provision?

A leading case upon this subject, cited and approved by this and many other courts, is *Lynch* v. *Nurdin*, 1 Q. B. 29, 35, 36. The facts in that case were these: The defendant's carman went into a house, leaving his horse and cart standing in a street for about half an hour, without any person to take care of them. The plaintiff, a lad about seven years of age, with several other children, were playing with the horse around the cart. During the carman's absence he got upon the cart. Another boy led the horse on while the plaintiff was attempting to get off the shaft. The plaintiff fell and was run over by the wheel, and his leg broken. The court was asked to direct the jury that there was no evidence in support of the plaintiff's case, his own negligence having brought the mischief upon him. This request was refused, and it was left to the jury to say, first, whether it was negligence in the defendant's servant to leave the horse and cart for half an hour in the manner disclosed; and, secondly, whether that negligence occasioned the accident. The case came before the Queen's Bench upon a rule *nisi* for a new trial on the grounds of misdirection, and because the verdict was against the evidence. Lord Denman, Chief Justice, delivering judgment, referred to the contention that the mischief was not produced by the mere negligence of the servant, but, at most, by that negligence in combination with two other active causes, namely, the advance of the horse in consequence of his being excited by the other boy, and the plaintiff's improper conduct in mounting the cart, and so committing a trespass upon the

defendant's chattel. On the former of these causes he deemed it unnecessary to dwell at length, observing: "For if I am guilty of negligence in leaving anything dangerous in a place where I know it to be extremely probable that some other person will unjustifiably set it in motion, to the injury of a third, and if that injury should be so brought about, I presume that the sufferer might have redress by action against both or either of the two, but unquestionably against the first." He then referred to the additional fact, appearing in that case, that the plaintiff had no right to enter the cart, and, if he had abstained from doing so, would have escaped injury, and proceeded to inquire whether the plaintiff, being thus a co-operative cause of his own misfortune, was thereby deprived of his remedy. He said : "The legal proposition that one who has by his own negligence contributed to the injury of which he complains cannot maintain his action against another in respect of it, has received some qualifications. Indeed, Lord Ellenborough's doctrine in *Butterfield* v. *Forrester*, 11 East, 60, which has been generally adopted since, would not set up the want of a superior degree of skill or care as a bar to the claim of redress. Ordinary care must mean that degree of care which may reasonably be expected from a person in the plaintiff's situation; and this would evidently be very small indeed in so young a child. But this case presents more than the want of care: we find in it the positive misconduct of the plaintiff an active instrument towards the effect." After reviewing the adjudged cases, and observing that the question of negligence must depend upon the circumstances of each case, he said that the jury " would naturally inquire whether the horse was vicious or steady ; whether the occasion required the servant to be so long absent from his charge, and whether, in that case, no assistance could have been procured to watch the horse; whether the street was at that hour likely to be clear, or thronged with a noisy multitude ; especially whether large parties of young children might be reasonably expected to resort to the spot. If this last-mentioned fact were probable, it would be hard to say that a case of gross negligence was not fully established. But the question

remains, can the plaintiff, consistently with the authorities, maintain his action, having been at least equally in fault? The answer is, that supposing that fact ascertained by the jury, but to this extent, that he merely indulged in amusing himself with the empty cart, then we think that the defendant cannot be permitted to avail himself of that fact. The most blamable carelessness of his servant having tempted the child, he ought not to reproach the child with yielding to that temptation. He has been the real and only cause of the mischief. He has been deficient in ordinary care; the child, acting with prudence or thought, has, however, shown these qualities in as great a degree as he could be expected to possess them. His misconduct bears no proportion to that of the defendant which produced it." Upon these grounds the action was held to be maintainable by the infant.

We have referred quite fully to the case of *Lynch* v. *Nurdin*, because it was cited in *Railroad Co.* v. *Stout*, 17 Wall. 657, 661, in connection with other cases in support of the rule, laid down in that case, that while a railway company is not bound to the same degree of care in regard to mere strangers who are unlawfully upon its premises that it owes to passengers conveyed by it, it is not exempt from responsibility to such injuries arising from its negligence or from its tortious acts.

In *Railroad Co.* v. *Stout*, the principal question was whether a railroad company was liable for an injury received by an infant, while upon its premises, from idle curiosity, or for purposes of amusement, if such injury was, under the circumstances, attributable to the negligence of the company. The facts in that case were these: The railway company owned and used for its roadbed and depot grounds a tract of unenclosed land, in the town of Blair, Nebraska, upon which the company had its depot house, a quarter of a mile from which was a turn-table belonging to it. The plaintiff, a boy a little over six years of age, together with one or two other boys, went to the company's depot, about a half a mile distant, without any definite purpose in view. Upon arriving there, the boys, at the suggestion of one of them, proceeded to the

turn-table, about a quarter of a mile distant, travelling along the defendant's roadbed or track. When they reached the turn-table, which was not attended or guarded, nor at that time fastened or locked, revolving easily on its axis, two of the boys commenced to turn it. The plaintiff's foot, while he was attempting to get on it, was caught between the end of the rail on the turn-table, as it revolved, and the end of the iron rail on the main track of the defendant's road, whereby it was badly cut and crushed, resulting in a serious and permanent injury. It appeared in evidence by one of the employés of the company that he had previously seen boys playing at the turn-table, but this fact was not communicated to the officers of the company having charge of the turn-table. The plaintiff had never been at the turn-table before.

Judge Dillon, Circuit Judge, in his charge to the jury, after observing that negligence was the omission to do something that a reasonable, prudent man, guided by those considerations that ordinarily regulate the conduct of human affairs, would do, or doing something that a prudent or reasonable man would not do under all the circumstances of the particular transaction under judicial investigation, and that if the turn-table, in the manner it was constructed and left, was not dangerous in its nature, the defendants would not be guilty of any negligence in not locking or guarding it, said: " The machine in question is part of the defendants' road and was lawfully constructed where it was. If the railroad company did not know, and had no good reason to suppose, that children would resort to the turn-table to play, or did not know, or had no good reason to suppose, that if they resorted there they would be likely to get injured thereby, then you cannot find a verdict against them. But if the defendants did know, or had good reason to believe, under the circumstances of the case, that the children of the place would resort to the turn-table to play, and that if they did they would or might be injured, then, if they took no means to keep the children away, and no means to prevent accidents, they would be guilty of negligence, and would be answerable for damages caused to children by such negligence."

That charge was held by this court to be an impartial and intelligent one. And after observing that the jury were at liberty to find for the plaintiff, if from the evidence it could justly be inferred that the railroad company, in the construction, location, management, or condition of the turn-table, had omitted that care and attention to prevent the occurrence of accidents which prudent and careful men ordinarily bestow, Mr. Justice Hunt, delivering the unanimous judgment of this court, said: "That the turn-table was a dangerous machine, which would be likely to cause injury to children who resorted to it, might fairly be inferred from the injury which actually occurred to the plaintiff. There was the same liability to injure him, and no greater, that existed with reference to all children. When the jury learned from the evidence that he had suffered a serious injury by his foot being caught between the fixed rail of the roadbed and the turning rail of the table, they were justified in believing that there was a probability of the occurrence of such accidents. So, in looking at the remoteness of the machine from inhabited dwellings, when it was proved to the jury that several boys from the hamlet were at play there on this occasion, and that they had been at play upon the turn-table upon other occasions, and within the observation and to the knowledge of the employés of the defendant, the jury were justified in believing that children would probably resort to it, and that the defendant should have anticipated that such would be the case. As it was, in fact, on this occasion, so it was to be expected that the amusement of the boys would have been found in turning this table while they were on it or about it. This could certainly have been prevented by locking the turn-table when not in use by the company. It was not shown that this would cause any considerable expense or inconvenience to the defendant. It could probably have been prevented by the repair of the broken latch. This was a heavy catch which, by dropping into a socket, prevented the revolution of the table. There had been one on this table, weighing some eight or ten pounds, but it had been broken off and had not been replaced. It was proved to have been usual with railroad companies to

have upon their turn-tables a latch or bolt, or some similar instrument. The jury may well have believed that if the defendant had incurred the trifling expense of replacing this latch, and had taken the slight trouble of putting it in its place, these very small boys would not have taken the pains to lift it out, and thus the whole difficulty would have been avoided. Thus reasoning, the jury would have reached the conclusion that the defendant had omitted the care and attention it ought to have given; that it was negligent; and that its negligence caused the injury to the plaintiff."

The principles announced in *Railroad Co.* v. *Stout* have been approved in many adjudged cases. In *Keffe* v. *Milwaukee & St. Paul Railway*, 21 Minnesota, 207, 211, which was also the case of an injury received by a child of tender years, while playing upon an unfastened and unguarded turn-table of a railroad company, the court, overruling a motion based on the pleadings for judgment rendered in favor of defendant, said: "Now, what an express invitation would be to an adult, the temptation of an attractive plaything is to a child of tender years. If the defendant had left this turn-table unfastened *for the purpose* of attracting young children to play upon it, knowing the danger into which it was thus alluring them, it certainly would be no defence to an action by the plaintiff, who had been attracted upon the turn-table and injured, to say that the plaintiff was a trespasser, and that his childish instincts were no excuse for his trespass. . . . It is true that the defendant did not leave the turn-table unfastened *for the purpose* of injuring young children; and if the defendant had no reason to believe that the unfastened turn-table was likely to attract and injure young children, the defendant would not be bound to use care to protect from injury the children that it had no good reason to suppose were in danger. But the complaint stated that the defendant knew that the turn-table, when left unfastened, was easily revolved; that, when so left, it was very attractive, and, when put in motion by them, dangerous to young children; and knew also that many children were in the habit of going upon it to play. The defendant, therefore, knew that by

leaving this turn-table unfastened and unguarded, it was not merely inviting young children to come upon the turn-table, but was holding out an allurement, which, acting upon the natural instincts by which such are controlled, drew them by those instincts into hidden danger." It was held that, under the circumstances, the child was not in fault in following the temptation set before it, and that the company violated its duty in not protecting him against the danger into which the child was thus led.

The Minnesota case is referred to by Judge Cooley in his Treatise on Torts. Alluding to the doctrine of implied invitation to visit the premises of another, he says: " In the case of young children, and other persons not fully *sui juris*, an implied license might sometimes arise when it would not on behalf of others. Thus, leaving a tempting thing for children to play with exposed, where they would be likely to gather for that purpose, may be equivalent to an invitation to them to make use of it; and, perhaps, if one were to throw away upon his premises, near the common way, things tempting to children, the same implication should arise." c. 10, p. 303.

An instructive case upon the general subject is *Powers* v. *Harlow*, 53 Michigan, 507, 514, 515. That was an action by an infant to recover damages for injuries received while he was on the premises of the defendant, a small parcel of which was under lease to the boy's father. The defendant had sometimes used dynamite for removing stumps that obstructed the cultivation of his lands. This dynamite was put up in boxes, in which were smaller boxes, containing exploders. One of these boxes was placed by the defendant's servant in a temporary shed on his farm. There was no enclosure about the shed. The word " powder" was written on the box, but neither the plaintiff nor his father could read, nor had either been told that anything dangerous was stored there. The shed was distant from any public highway, but of the several parcels of land leased by the defendant, the one leased by the plaintiff's father was nearest to the shed, (within ten rods or less,) and to the farm road used by the defendant's lessees in reaching the parcels respectively cultivated by them.

According to the facts the lessor had not restricted the lessee to any particular route in reaching the part leased by him. The tenant was within the limits of his right if he did not depart altogether from the direct line between the end of the farm road and the lot which had been leased to him. The defendant's superintendent went to the box in the shed for dynamite and exploders as he had occasion to use them. The evidence also tended to show that the handling of the exploders by persons who were ignorant of their nature, or were careless, or under circumstances rendering them liable to accidental concussion, would be extremely hazardous.

The Supreme Court of Michigan, speaking by Chief Justice Cooley, said: " Under the circumstances disclosed in this case the invitation to the tenant to come upon the land was an invitation which embraced his family also. The tenant was a laboring man, apparently of small means; and it is customary for such men to be assisted in their manual labor by the members of their families; and the defendant must have understood that the persons who rented of him these small patches of land would be likely to avail themselves of the services of their children in cultivating them." Again, in the same case: " Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them must calculate upon this, and take precautions accordingly. If they leave exposed to the observation of children anything which would be tempting to them, and which they in their immature judgment might naturally suppose they were at liberty to handle or play with, they should expect that liberty to be taken. . . . A man of ordinary prudence, if told that so dangerous an article was so carelessly stored, might well have deemed the statement incredible. We cannot under these circumstances say that the plaintiff's father was chargeable with fault in not suspecting danger and warning his children away from it, or that the child himself was blameworthy in acting upon the childish instincts and propensities which combined with the negligence of defendant's servant to bring the danger upon him." To the same general

effect are many other cases, some of which, for convenience of reference, are given in the margin.[1] In nearly all of those cases that of *Lynch* v. *Nurdin* is cited with approval.

It has been sometimes said that the case of *Lynch* v. *Nurdin* was overruled by *Mangan* v. *Atterton*, L. R. 1 Ex. 239; *S. C.* 4 H. & C. 388. But, in reference to the latter case, Lord Chief Justice Cockburn, with whom concurred Manisty, J., said in *Clark* v. *Chambers*, 3 Q. B. D. 327, 338 (1878): "The defendant had there exposed in a public market place a machine for crushing oil cake without its being thrown out of gear or the handle being fastened, or any person having the care of it. The plaintiff, a boy of four years of age, returning from school with his brother, a boy of seven, and some other boys stopped at the machine. One of the boys began to turn the handle. The plaintiff, at the suggestion of his brother, placed his hand on the cogs of the wheels, and the machine being set in motion, three of his fingers were crushed. It was held by the Court of Exchequer that the defendant was not liable, first, because there was no negligence on the part of the defendant, or, if there was negligence, it was too remote; and, secondly, because the injury was caused by the act of the boy who turned the handle and of the plaintiff himself, who was a trespasser. With the latter ground of the decision we have in the present case nothing to do; otherwise we should have to consider whether it should prevail against the cases cited, with which it is

---

[1] *Robinson* v. *Cone*, 22 Vermont, 213; *Daley* v. *Norwich & Worcester Railroad*, 26 Connecticut, 591; *Rauch* v. *Lloyd*, 31 Penn. St. 358; *Gillis* v. *Pennsylvania Railroad*, 59 Penn. St. 129, 142; *Hydraulic Works* v. *Orr*, 83 Penn. St. 332, 335; *Norfolk & Petersburg Railroad* v. *Ormsby*, 27 Gratt. 455, 476; *Morrison* v. *Cornelius*, 63 N. C. 346, 349; *Morgan* v. *Cox*, 22 Missouri, 373, 378; *Borland* v. *Missouri Railroad*, 36 Missouri, 484, 490; *Walsh* v. *Miss. Valley Transp. Co.*, 52 Missouri, 434, 439; *Macon & Western Railroad* v. *Davis*, 18 Georgia, 679, 686; *Government Street Railroad* v. *Hanlon*, 53 Alabama, 70, 79; *Fraler* v. *Sears Union Water Co.*, 12 California, 555, 559; *Richmond* v. *Sacramento Valley Railroad*, 18 California, 351, 356; *Bellefontaine & Indiana Railroad* v. *Snyder*, 18 Ohio St. 399, 410; *Morris* v. *Litchfield*, 35 N. H. 271, 278; *Weick* v. *Lander*, 75 Illinois, 93, 97; *Central Railroad Co.* v. *Moore*, 4 Zabr. (24 N. J. Law) 824.

obviously in conflict.  If the decision as to negligence is in conflict with our judgment in this case, we can only say we do not acquiesce in it.  It appears to us that a man who leaves in a public place, along which persons, and amongst them children, have to pass, a dangerous machine which may be fatal to any one who touches it, without any precaution against mischief, is not only guilty of negligence, but of negligence of a very reprehensible character, and not the less so, because the imprudent and unauthorized act of another may be necessary to realize the mischief to which the unlawful act or negligence of the defendant has given occasion."

We adhere to the principles announced in *Railroad Co.* v. *Stout, supra.*  Applied to the case now before us, they require us to hold that the defendant was guilty of negligence in leaving unguarded the slack pile, made by it in the vicinity of its depot building.  It could have forbidden all persons from coming to its coal mine for purposes merely of curiosity and pleasure.  But it did not do so.  On the contrary, it permitted all, without regard to age, to visit its mine, and witness its operation.  It knew that the usual approach to the mine was by a narrow path skirting its slack pit, close to its depot building, at which the people of the village, old and young, would often assemble.  It knew that children were in the habit of frequenting that locality and playing around the shaft-house in the immediate vicinity of the slack pit.  The slightest regard for the safety of these children would have suggested that they were in danger from being so near a pit, beneath the surface of which was concealed (except when snow, wind, or rain prevailed) a mass of burning coals into which a child might accidentally fall and be burned to death.  Under all the circumstances, the railroad company ought not to be heard to say that the plaintiff, a mere lad, moved by curiosity to see the mine, in the vicinity of the slack pit, was a trespasser, to whom it owed no duty, or for whose protection it was under no obligation to make provision.

In *Townsend* v. *Wathen,* 9 East. 277, 281, it was held that

if a man place dangerous traps, baited with flesh, in his own ground, so near to a highway, or to the premises of another, that dogs passing along the highway, or kept in his neighbor's premises, would probably be attracted by their instinct into the traps, and in consequence of such act his neighbor's dogs be so attracted and thereby injured, an action on the case would lie. "What difference," said Lord Ellenborough, C. J., "is there in reason between drawing the animal into the trap by means of his instinct which he cannot resist, and putting him there by manual force?" What difference, in reason we may observe in this case, is there between an express license to the children of this village to visit the defendant's coal mine, in the vicinity of its slack pile, and an implied license, resulting from the habit of the defendant to permit them, without objection or warning, to do so at will, for purposes of curiosity or pleasure? Referring to the case of *Townsend* v. *Wathen,* Judge Thompson, in his work on the Law of Negligence, Vol. I, p. 305 n., well says: "It would be a barbarous rule of law that would make the owner of land liable for setting a trap thereon, baited with stinking meat, so that his neighbor's dog, attracted by his natural instincts, might run into it and be killed, and which would exempt him from liability for the consequences of leaving exposed and unguarded on his land a dangerous machine, so that his neighbor's child, attracted to it and tempted to intermeddle with it by instincts equally strong, might thereby be killed or maimed for life." Indeed, the present case is stronger than the one supposed by the writer, in that the defendant was aware of the fact that children often visited its mine.

The evidence of the two witnesses, introduced by the defendant, that a boy was warned off the coal shaft on the morning of the day when plaintiff fell into the slack pit, had no reference to the plaintiff. The boy to whom they referred was one who was at the shaft-house in the forenoon. The plaintiff did not go there until the afternoon. Both of these witnesses saw the plaintiff, at the time of the trial, and were unable to identify him as the boy to whom the warning

was given. But if this warning was given to the plaintiff, it had reference only to the danger of his being on the platform of the shaft-house, and not to any danger of his being near that house or the vicinity of the coal mine.

Nor is there any force in the suggestion that the plaintiff was negligent in falling into the burning slack. The conduct of the persons who came out of the coal pit, with lamps upon their heads and with dirty faces, yelling "Let's grease him," "Let's burn him," frightened the lad, and caused him to run in the direction of the town where his mother was staying. He ran towards the only path that was open to him, and made such efforts as he could to escape those who threatened to harm him. His falling into the slack heap was accidental, and in no proper or just sense the result of negligence. The question of negligence upon the part of an infant must be determined with reference to his age and to the situation in which, at the time of the injury, the circumstances placed him. The authorities cited — indeed, all the adjudged cases — agree, as declared by the Court of Appeals of New York, that in applying the rule that a person who seeks to recover for a personal injury, sustained by another's negligence, must not himself be guilty of negligence that substantially contributed to the result, the law discriminates between children and adults, the feeble and the strong, and only requires of each the exercise of that degree of care to be reasonably expected in view of his age and condition. *Reynolds* v. *N. Y. Central &c. Railroad,* 58 N. Y. 248, 252. And so, as declared by the same court, persons in sudden emergencies, and called to act under peculiar circumstances, are not held to the exercise of the same degree of caution as in other cases. *Thurber* v. *Harlem Bridge &c. Railroad,* 60 N. Y. 326, 336. Even in the case of an employé of a railroad company, claiming to have been injured as the result of the company's negligence, this court has said that in determining whether he has recklessly exposed himself to peril, or failed to exercise the care for his personal safety that might be reasonably expected, regard must always be had to the exigencies of his position, indeed, to all the circumstances of the particular occasion.

*Kane* v. *Northern Central Railroad Company*, 128 U. S. 91, 95. Where human life or personal safety is involved, and the issue is one of negligence, the law will not lightly impute negligence to an effort, made in good faith, to preserve the one or to secure the other, unless the circumstances, under which that effort was made, show recklessness or rashness.

Equally without merit is the suggestion that the mother was negligent in permitting the plaintiff to visit the coal mine. There was, in fact, very little danger, under ordinary circumstances, in visiting the mine, except that which came from its contiguity to the burning slack pile. But of the existence of that concealed danger both the plaintiff and his mother were ignorant. If the negligence of a parent can be imputed to the child so as to prevent the latter from maintaining an action for personal injuries received by him from others, — upon which question we express no opinion, — it is sufficient to say that negligence cannot be attributed to the plaintiff's mother because of her consenting that her son might visit the coal mine in company with one of the trapper boys of the village, who was, presumably, capable of caring for him while away from the mother.

At the close of the charge by the court there was a general exception to the withdrawal from the jury of the questions of the defendant's negligence and the plaintiff's contributory negligence.

The court correctly said that there was no controversy about the leading facts of the case, and that the defendant was guilty of negligence. As the facts were undisputed, the question of liability upon the ground of negligence was one of law, and as the facts showed negligence by the railroad company, which was the primary, substantial cause of the injury complained of, it was not error in the court to so declare.

The only question that could arise upon this part of the case is whether the court should have instructed the jury — as, in effect, it did — that the failure of the company to put a fence around the slack pit, as required by the statute of Colorado, was negligence, of which the plaintiff could com-

plain in this action for personal injuries sustained by him. Primarily, that statute was intended for the protection of cattle and horses. But it was not, for that reason, wholly inapplicable to the present case upon the issue as to negligence. In *Hayes* v. *Michigan Central Railroad*, 111 U. S. 228, 240, which was an action by an infant for personal injuries sustained by the alleged negligence of a railroad company in not properly guarding its line within the limits of the city of Chicago, this court, speaking by Mr. Justice Matthews, said : " In the analogous case of fences required by the statute, as a protection for animals, an action is given to the owners for the loss caused by the breach of the duty. And although in the case of injury to persons by reason of the same default, the failure to fence is not, as in the case of animals, conclusive of the liability, irrespective of negligence, yet an action will lie for the personal injury, and this breach of duty will be evidence of negligence. The duty is due, not to the city as a municipal body, but to the public, considered as composed of individual persons ; and each person specially injured by the breach of the obligation is entitled to his individual compensation, and to an action for its recovery." The non-performance by the railroad company of the duty imposed by statute, of putting a fence around its slack pit, was a breach of its duty to the public, and, therefore, evidence of negligence, for which it was liable in this case, if the injuries in question were, in a substantial sense, the result of such violation of duty.

Nor did the court err in saying to the jury that the disputed issue was the question of damages. Looking at all the facts, there was an entire absence of any just ground for imputing contributory negligence to the plaintiff. If the jury had so found, the court could properly have set aside the verdict as being against the evidence. Upon the question of negligence, the case is within the rule that the court may withdraw a case from the jury, altogether, and " direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed or is of such conclusive character that the court, in the exercise of a sound judicial

discretion, would be compelled to set aside a verdict returned in opposition to it." *Delaware, Lackawanna &c. Railroad* v. *Converse*, 139 U. S. 469, 472, and authorities there cited; *.Elliott* v. *Chicago, Milwaukee & St. Paul Railway*, 150 U. S. 245; *Anderson County Commissioners* v. *Beal*, 113 U. S. 227, 241.

*Judgment affirmed.*