PETER COSTA et al., Appellants, v WALTER HICKS et al., Respondents.

Second Department, December 27, 1983

APPEARANCES OF COUNSEL

*McCormack & Damiani* (*Ronald G. McCormack* of counsel), for appellants.

*Hurley, Fox, Selig & Robustelli* (*Ralph S. Joseph* of counsel), for Walter Hicks, respondent.

*Arthur Moskoff* for Walter Hicks, Jr., respondent.

OPINION OF THE COURT

RUBIN, J.

Plaintiffs commenced this action to recover damages for personal injuries sustained by the infant plaintiff Michael Costa, then age 7, when a motorcycle allegedly owned by

defendant Walter Hicks and operated by his son Walter Hicks, Jr. (Walter, Jr.), then age 14, collided with Michael on the morning of July 7, 1977, in the vicinity of the Vassallo residence on Central Avenue, Congers, New York. The plaintiff Peter Costa, Michael's father, asserted a derivative cause of action to recover damages for loss of services and medical expenses. It was claimed that the infant defendant, Walter, Jr., was liable to plaintiffs for his alleged negligence in operating the motorcycle and that his father, Walter Hicks, was vicariously liable as the alleged owner of the motorcycle. Irrespective of any negligence on the part of the infant defendant, plaintiffs sought to predicate the liability of defendant Walter Hicks, as a parent, on the additional theory that he was negligent in entrusting to his son an instrument which, because of its nature, use and purpose, or, because of the child's known propensities, was so dangerous as to constitute, in the hands of that child, an unreasonable risk to others.

A trial was held and the jury rendered the following findings of fact:

(1) the owner of the motorcycle was the infant, Walter Hicks, Jr.;

(2) defendant Walter Hicks, as a parent, did not negligently entrust, permit or allow his son to possess and use a dangerous instrument, namely the 1976 Bultaco motorcycle;

(3) Walter, Jr., was not negligent in his operation of the motorcycle; and

(4) the infant plaintiff was not negligent.

We are of the opinion that the factual conclusions reached by the jury are against the weight of the evidence.

The defendant father purchased, by personal check, a 1976, 250cc Bultaco "trials" motorcycle for his 14-year-old son Walter, Jr., approximately one month prior to the collision. The bill of sale was made out to "Walter Hicks", without the suffix "Jr." According to defendants, Walter, Jr., repaid his father from money he had saved and the proceeds from the sale of the fifth motorcycle the boy had owned over a five-year period — a 125cc Power Dyne. Neither defendant could recall if the repayment equaled

the cost of the motorcycle. Since the 250cc Bultaco motorcycle was a trials competition bike, it was not equipped with a rear view mirror, horn, or headlight. The motorcycle was neither inspected nor registered and Walter, Jr., did not have a motorcycle license. Walter, Jr., had participated in trials competition with smaller motorcycles, but the 193-pound, 250cc Bultaco was the largest machine the 14-year-old boy had ever used. The maximum speed the five-gear motorcycle could attain was 35 miles per hour.

Walter Hicks placed restrictions on his son's use of the motorcycle because he knew that absent such limitations, the vehicle's use was dangerous to his son and others. Therefore, Walter, Jr., was directed not to operate the motorcycle off his father's property unless accompanied by either his father or his older brothers, all of whom owned motorcycles. Walter, Jr., admitted that he had violated said restriction on prior occasions and the father admitted that he possessed knowledge of the violations. Furthermore, the father acknowledged that the motorcycle was capable of being locked, chained or otherwise secured at the house, which would have prevented its use off his premises when neither he nor an older son was present. Such measures were not taken and Walter, Jr., continued to have unimpeded access to the motorcycle. On the day of the collision Walter, Jr., was violating his father's restrictions by operating the motorcycle off his father's premises, without his permission and unaccompanied by an older member of the family.

The scene of the accident is a residential neighborhood where many small children are accustomed to playing on the dirt and gravel streets and in the nearby woods. Old Haverstraw Road is the only paved street in the neighborhood, running in a north-south direction. The defendants' residence is located on Chester Avenue, a dirt and gravel road, running east and west. Parallel with and to the south of Chester Avenue is Central Avenue. Central Avenue's road surface is similarly composed of dirt and gravel. Both Chester Avenue and Central Avenue are dead-end streets which intersect with Old Haverstraw Road to the east. A path through the woods, about 200 feet long, connects Chester Avenue with Central Avenue. The wooded path

stops at the northern edge of Central Avenue, approximately 250 feet west of the intersection of Central Avenue and Old Haverstraw Road. On the south side of Central Avenue, across from the wooded path, is the Vassallo residence. On the day of the accident a six-inch high sand pile was located a short distance west of the wooded path, in the middle of Central Avenue. A milk truck was parked on the north side of Central Avenue, approximately 20 feet west of the sand pile. West of the parked milk truck was another path through the woods, leading to the residence of Walter, Jr.'s friend, Doug Bull.

Aside from the infant plaintiff (Michael) and defendant Walter, Jr., the only eyewitnesses to the accident were Joseph Griffin, then age eight, and Michael's younger brother, Jeffrey Costa, then age five; both testified on behalf of the plaintiffs.

According to plaintiffs' eyewitnesses, the infant plaintiff, his brother Jeffrey and Joe Griffin, were standing on the front lawn of the residence of the Plesach family, which is located at the end of Chester Avenue. They observed Walter, Jr., riding his motorcycle, "fairly fast", back and forth on Chester Avenue. During these runs, Walter, Jr., performed more than one "wheelie", meaning he raised the front wheel off the ground and rode on the rear wheel only. Walter, Jr.'s father acknowledged that a "wheelie" was a dangerous maneuver, especially in the vicinity of children. Two other children, under the age of five, were also present on the Plesach's front lawn. The memory of the witnesses as to the number of wheelies performed and whether Walter, Jr., performed them at the children's request differed.

Subsequently, Walter, Jr., proceeded to drive the motorcycle south along the wooded path connecting Chester Avenue with Central Avenue. The children followed. Some discrepancies in the plaintiffs' witnesses' testimony exist as to the events which occurred after the children arrived at the edge of the wooded path, where it exits onto Central Avenue.

Joseph Griffin, age 12 at the time of the trial, testified that upon arriving at the edge of the wooded path, where it ˙ exits onto Central Avenue, he observed Walter, Jr., turn-

ing his motorcycle around at the intersection of Central Avenue and Old Haverstraw Road. Walter, Jr., then drove west on Central Avenue, passing the witness. After Walter, Jr., passed the parked milk truck, he turned his motorcycle around and proceeded east on Central Avenue. Jeffrey Costa was standing in the path of the motorcycle, i.e., the area between the sand pile and the Vassallo's front lawn. The motorcycle was "[c]lose" to and "about to run Jeffrey down", when the infant plaintiff Michael ran off the sand pile and pushed his younger brother out of the way. Michael pushed Jeffrey in the direction of the Vassallo's house. The motorcycle then hit the infant plaintiff.

Jeffrey Costa, age nine at the time of the trial, testified that while standing at the edge of the wooded path, he saw Walter, Jr., drive past him, going east on Central Avenue, toward Old Haverstraw Road. During this run, Walter, Jr., did one "wheelie". When Walter, Jr., reached Old Haverstraw Road, he turned around and proceeded to drive to the west end of Central Avenue, passing the children. Walter, Jr., stopped at the parked milk truck, turned around and drove east, back toward Old Haverstraw Road. All the boys, including the witness, were standing near the edge of the wooded path, but Jeffrey could not remember his brother Michael's nor Joe Griffin's exact location. The witness recalled that his brother began to run across Central Avenue toward the Vassallo's house when Walter, Jr.'s motorcycle was "stopped" near the milk truck. Jeffrey next saw the motorcycle collide with Michael at the edge of the Vassallo's yard during Walter, Jr.'s operation of the motorcycle in an easterly direction, toward Old Haverstraw Road.

Michael Costa, the infant plaintiff, age 11 at the time of the trial, testified that while standing on the sand pile on Central Avenue he saw Walter, Jr., ride past him on the motorcycle and do wheelies. He did not recall how many times Walter, Jr., drove past him, but it was more than once. The last thing he remembered was seeing Walter, Jr., drive around the parked milk truck, going west on Central Avenue. He did not see the motorcycle after it went around the milk truck, but he thought "it was on the other side".

The next thing he recalled was waking up in a car on the way to the hospital.

Walter Hicks, Jr., age 18 at the time of trial, a high school graduate and an auto mechanic, presented a different version of the events leading up to the collision. Although he admitted that he twice raised the front wheel of the motorcycle off the ground and dropped it while riding up and down Chester Avenue, he explained that he was not doing wheelies, but was checking the front wheel suspension after having changed the fork oil. He observed a number of children on the Plesach's lawn, but he did not have a conversation with them. He then drove through the wooded path to Central Avenue. He did not see any children following him; the motorcycle was not equipped with a rear view mirror. At the end of the wooded path, he drove west on Central Avenue, past the parked milk truck, to another wooded path which leads to the house of his friend Doug Bull. He never turned east on Central Avenue to go toward Old Haverstraw Road, nor did he do wheelies on Central Avenue. Upon arriving at Bull's residence, he observed that his friend's van was not in the driveway so he proceeded to drive home, retracing his prior route. When he reached the parked milk truck on Central Avenue, he saw six or seven children playing in the sand pile. He did not slow down, but continued to proceed east along the path which ran between the sand pile and the Vassallo's front lawn, at a speed of approximately 10 to 15 miles per hour. When he was 10 feet from the sand pile, all the children started running in different directions. The infant plaintiff and his brother ran south, toward Vassallo's residence. While applying his back brakes, Walter, Jr., turned south, off the path and onto the Vassallo's lawn. On the lawn, at the point approximately 10 feet from the edge of Central Avenue, the left handlebar of the motorcycle collided with the infant plaintiff's forehead. The motorcycle fell to the ground about three feet past the point of impact.

Whether defendant Walter Hicks, Jr., exercised reasonable care in operating the motorcycle under the circumstances of this case was dependent upon several factors, not the least important of which was speed.

Walter, Jr., maintained that he was proceeding at 10 to 15 miles per hour. The credibility of this statement is suspect when evaluated in light of the testimony of plaintiffs' expert that the subject motorcycle was equipped with five gears, which enables it to accelerate to its maximum speed of 35 miles per hour over a shorter period of time and distance than the average motorcycle, and the statement of defendant Walter, Jr., in his deposition, that the motorcycle was in fourth gear when the accident happened.

Since the age of the plaintiffs' eyewitnesses negated each one's ability to render an accurate speed estimation, it was necessary for plaintiffs to offer medical evidence of the infant plaintiff's injuries and the degree of force necessary to cause those injuries (see *Williams v Adams,* 46 AD2d 952). Said evidence would have had a direct bearing on the force of the impact and the speed of the motorcycle (see *Naumann v Richardson,* 76 AD2d 917, 918). However, plaintiffs were precluded from proffering such evidence due to the erroneous ruling of the court directing a bifurcated trial. It is well settled that where the nature of the injuries has an important bearing on the issue of liability, separate trials on the issues of liability and damages should not be held (*Schwartz v Binder,* 91 AD2d 660). Due to the prejudice which accrued to plaintiffs from the court's erroneous ruling, a new trial is necessary in which both the issues of liability and damages will be tried together.

Other evidence adduced at trial preponderates in support of a finding that the infant defendant, who must be held to an adult standard of care (see *Smedley v Piazzolla,* 59 AD2d 940; *Reiszel v Fontana,* 35 AD2d 74; Prosser, Torts [4th ed], § 32, p 156; PJI 2:23), did not exercise reasonable care under the circumstances. For example, the motorcycle was equipped with front and rear brakes, yet Walter, Jr., applied only the rear brakes. Although a degree of skill is required to safely apply the front brakes of a motorcycle, he conceded that he had applied the front brakes on occasions prior to the accident. Expert testimony was elicited that the stopping distance could be reduced by half if both brakes were applied. The motorcycle came to rest three feet from the point of impact.

There is evidence that Walter, Jr., did not exercise the degree of care required of him when confronted with small children. " 'Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them must calculate upon this, and take precautions accordingly' " (*Union Pacific Ry. Co. v McDonald,* 152 US 262, 277, quoting *Powers v Harlow,* 53 Mich 507, 515; *Stein v Palisi,* 308 NY 293, 297 [children playing in the streets]; PJI 2:11).

The maneuver of raising the front tire of a motorcycle and dropping it to the ground, regardless of its characterization, is concededly dangerous not only to the operator but to others. Shortly prior to the accident Walter, Jr., admittedly performed this maneuver twice on Chester Avenue while in the vicinity of children varying from age three to age eight. Such evidence is some indication of the care Walter, Jr., exercised on the date in question. Another indication of the lack of precautions Walter, Jr., took can be discerned from his own testimony that upon observing six or seven small children playing in a sand pile adjacent to the intended path of the motorcycle on Central Avenue, he did not slow down the motorcycle but proceeded at a speed of 10 to 15 miles per hour. He only applied his brakes when the infant plaintiff started to run across his path while approximately 10 feet from the motorcycle.

As to the second theory submitted to the jury for imposing liability on the defendant father for negligently entrusting his son with the use of a dangerous instrument, we similarly conclude that the evidence adduced at trial preponderates greatly in plaintiffs' favor.

The composition of the defendants' neighborhood consisted of several small children who were accustomed to playing on the dirt roads and in the woods and who were at an age when a motorcycle would prove an attraction. The subject motorcycle was not equipped with a headlight or horn to warn children of its approach nor did it have a rear view mirror to enable the operator to see if children were following the vehicle. Although Walter, Jr., had prior experience with smaller motorcycles, the 193-pound Bultaco was the largest machine he ever possessed and he had

only possessed the motorcycle a month prior to the collision.

Although the defendant father recognized the necessity for placing restrictions on the use of the motorcycle to protect not only his son but others, the father was cognizant of his son's proclivity to drive to the Bull's residence in violation of the restriction to remain on his property unless accompanied by an older member of the family. Despite knowledge of said violations and the capability of taking measures to insure compliance with this restriction, the motorcycle continued to be stored in the father's garage, freely available for use by his son at any time. Moreover, at trial, the defendant father acknowledged, in retrospect, that a motorcycle was a dangerous instrument, that allowing his son to use it was not a reasonable act and that he took a risk when he did allow its use.

Though parents are permitted to delegate to their children the decision to participate in dangerous activities, they are not absolved from liability for harm incurred by third parties when the parents unreasonably, with respect to such third persons, permit their children to use dangerous instruments (*Nolechek v Gesuale,* 46 NY2d 332, 339; *Lalomia v Bankers & Shippers Ins. Co.,* 35 AD2d 114, affd 31 NY2d 830; *Carmona v Padilla,* 4 AD2d 181, affd 4 NY2d 767; *Pico v Canini,* 47 AD2d 951; see, also, Restatement, Torts 2d, §§ 308, 316).

The evidence herein preponderates in favor of findings that:

(1) this motorcycle constituted a dangerous instrument because of the composition of the neighborhood and the use of its streets as a play area, the nature of the machine and its lack of warning devices, and the infant defendant's known propensities;

(2) the defendant father was aware of and capable of controlling the motorcycle's use;

(3) said parent violated his duty to exercise reasonable care to protect the infant plaintiff from harm resulting from his son's improvident use of a dangerous instrument; and

(4) said parent's negligence was a proximate cause of the infant plaintiff's injuries.

With respect to the issue of ownership of the motorcycle, as it pertains to imposing vicarious liability upon the defendant father for his son's alleged negligent operation of said vehicle, we note that evidence of insurance is admissible to prove ownership and said evidence is not rendered incompetent by the fact it might tend to show that the defendants were insured (see *Flieg v Levy,* 148 App Div 781, affd 208 NY 564; *McGovern v Oliver,* 177 App Div 167). Since there is to be a new trial, we indicate, for the guidance of the Trial Judge, that evidence that the defendant father stated to either of the two carriers which had issued policies of insurance to him that he was the owner of the vehicle would be admissible on the issue of ownership.

Furthermore, the evidence proffered at this trial on the issue of ownership of the subject motorcycle was legally sufficient to warrant an instruction to the jury as to the joint ownership of said vehicle by the father and son. An instruction as to sole or joint ownership should be included in the court's future charge to the jury.

We further note that in view of the alleged injuries set forth in plaintiffs' bill of particulars, which includes a fractured skull, and the infant plaintiff's alleged inability to recall the collision, the plaintiffs have a triable claim of amnesia and should be permitted to introduce medical evidence to substantiate said claim at trial. Whether or not the infant plaintiff suffers from amnesia is a question for the jury to determine. The jurors should be instructed that an amnesiac plaintiff is not held to as high a degree of proof as would be a plaintiff who can himself describe the occurrences, provided they are satisfied that plaintiffs have met their burden of proving amnesia by clear and convincing evidence (*Schechter v Klanfer,* 28 NY2d 228; see PJI 1:62). In order for a plaintiff to satisfy said burden, because of the danger of feigning, the evidence of amnesia must be supported by the objective nature and extent of the physical injuries sustained and said amnesia must clearly be the result of the collision (*Schechter v Klanfer, supra*). Absent any medical proof of amnesia (see *Jennings v State of New York,* 55 AD2d 745) or causation, plaintiffs will not be entitled to the more lenient standard of proof.

Accordingly, the judgment appealed from should be reversed and a new trial should be granted on the combined issues of liability and damages.

MOLLEN, P. J., GULOTTA and O'CONNOR, JJ., concur.

Judgment of the Supreme Court, Rockland County, dated October 13, 1981, reversed, on the law and the facts, and a new trial granted on the combined issues of liability and damages, with costs to abide the event.