# CLEMENTS *v.* POTOMAC ELECTRIC POWER COM-PANY.*

PERSONAL INJURIES; ELECTRIC WIRES; CONTRIBUTORY NEGLIGENCE; NEGLIGENCE; POLICE POWER; MUNICIPAL REGULATIONS.

1. In an action for personal injuries suffered by the plaintiff from coming in contact with electric wires, where there is evidence, that the wires had been in position for years, and that there was nothing to indicate that they constituted a lighting circuit, it is error to refuse to permit the plaintiff to answer a question intended to elicit the fact that he believed the wires were old and disused, for his belief as to such fact is material on the question of contributory negligence.

2. Whether or not it is permissible, in an action for personal injuries caused by contact with defectively insulated high-voltage wires, for the defendant to introduce evidence of the general custom of electric lighting companies throughout the country to use uninsulated wires, it is clearly erroneous to admit such evidence where there is a municipal regulation expressly prohibiting the use of uninsulated wires.   (Following *The Shetland* v. *Johnson,* 21 App. D. C. 416, 421.)

3. Where, in an action for personal injuries caused by contact with elec-

---

*Electric Wires—Injuries Resulting from.*—Various questions dealing with the liability for injuries inflicted by electric wires are discussed, and the authorities presented, in the following editorial notes: Negligence in general, as to electric wires on or in buildings, including contributory negligence, note to *Griffin* v. *United Electric Light Co.* 32 L. R. A. 400; liability for injuries by electric wires in highways, note to *Denver Consol. Electric Co.* v. *Simpson,* 31 L. R. A. 566; electric wires as a nuisance subject to municipal control, notes to *Harrington* v. *Providence,* 38 L. R. A. 306, and *State* v. *New Orleans City & Lake R. Co.* 39 L. R. A. 621; police regulation of electric wires and electric companies, note to *State ex rel. Laclede Gaslight Co.* v. *Murphy,* 31 L. R. A. 798; liability of third persons to persons receiving light and power from electric light company, for negligently depriving them of such power by breaking the wires, note to *Byrd* v. *English,* 64 L. R. A. 94.

D. C.]                        Statement of the Case.

tric wires, there is evidence that the wires carried a current of 2,000 volts, and that their sole use was to light two houses and a small street lamp, it is error to refuse to permit the plaintiff to ask a witness what voltage would be necessary for such purposes, for such question is material as bearing on the defendant's negligence in maintaining a dangerous voltage.

4. Section 4, article 11, of the police regulations of the District of Columbia, and section 220 of the building regulations, requiring all high-voltage electric wires to be thoroughly insulated, are a proper and reasonable exercise of the police power conferred by Congress upon the District Commissioners.

5. A municipal regulation requiring all high-voltage electric wires to be thoroughly insulated imposes a duty upon the owner of the wires for the benefit of the public, and every person specially injured by a breach of this duty is entitled to an action, whether or not expressly conferred by the regulation. (Following *Lindsey* v. *Pennsylvania R. Co. post,* 503.) The fact that the regulation imposes a criminal liability for its violation is immaterial.

6. Where, in an action for personal injuries, the evidence shows that the defendant has neglected to comply with a municipal regulation, and that, without contributory negligence on the part of the plaintiff, such neglect directly caused the injury, negligence exists as a matter of law, and it is error to refuse to charge the jury to that effect.

7. Where a municipal regulation provides that all high-voltage electric wires shall be thoroughly insulated, a member of the public is entitled to the protection which would be afforded by compliance with such regulation, and has a right to presume that it has been complied with, or that the wires are not used to convey a dangerous current.

No. 1490.    Submitted December 12, 1905.    Decided January 4, 1906.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia in favor of the defendant in an action for personal injuries.        *Reversed.*

The COURT in the opinion stated the facts as follows:

This action was brought by James R. Clements, by his father as next friend, against the Potomac Electric Power Company, for personal injuries sustained September 11, 1902. The trial resulted in a verdict and judgment for the defendant, from which the plaintiff has appealed.

Plaintiff's evidence tended to show the following facts: There is a vacant lot, about ¼ of an acre in area, on Thirty-second street between N and O streets N. W., in the city of Washington, which is substantially surrounded by houses. Access to the same is had through a narrow alley and the back yards of adjacent houses. The lot had been used for many years as a common playground by the lads living in the neighborhood. It formerly had a number of trees upon it, but one only remained on September 11, 1902. This tree was a paper mulberry about 18 inches in diameter near the ground and about 30 feet high. At the date aforesaid, it was covered with leaves. It had been a common practice for the lads to climb into the branches of the tree. About 4 feet from the base of the tree stood a pole with a cross-bar on which were suspended two wires about 18 inches apart. These wires ran through an extended branch of the tree about 2½ feet from the top of the tree. On September 11, 1902, plaintiff, who was sixteen years of age, and another lad, climbed into the tree. Another lad, seeing them from his back window, came out and joined them. Plaintiff climbed higher than his companions, who sat on a limb conversing, and paying no particular attention to plaintiff's movements. Hearing a hissing noise, they looked up and saw blue flames coming from plaintiff's left hand. Plaintiff had one foot on the tree branch, another on one of the series of stepping irons inserted in the pole, and beginning about 10 feet above the ground. His head was between the wires and his left hand on one of them; the other hand was not noticed. The boys climbed down, and plaintiff fell upon them.

One of plaintiff's fingers was burned off and found upon the ground. As a result of the accident he lost four fingers from his left hand and the thumb and two fingers from the right. His wrist and elbow were also burned.

Plaintiff, himself, said that he did not remember taking hold of the wire. He had climbed the tree many times, but had never touched the wire before. The next thing he remembers was that he was waked up with a crowd around him. He was about 3 feet above his companions. Paid no attention to the wires; was not

thinking of them, and had never noticed them in the tree before. His purpose in going higher than the others was to make room for them. When asked if there was anything to prevent his seeing the wires, he said that the tree was full of leaves and he did not notice them.

A number of witnesses testified to the common use of the lot as a playground for boys after school time, for many years. Some witnesses saw their own boys there often.

Other testimony tended to show that the pole and wires had been erected by a former electric lighting company a number of years before. Several companies succeeded to their possession, until they passed into the possession of defendant, a corporation organized about the year 1896. The lot was within the "fire limits" of the city of Washington.

Plaintiff read in evidence several acts of Congress empowering the District Commissioners to enact police and building regulations for the protection of life and property. The following police regulation, in force for some years before September 11, 1902, was then read in evidence:

"Sec. 4, article 11. No person shall erect, use, or maintain any overhead wire or wires within the District of Columbia, conveying or transmitting a current of voltage dangerous to life, unless the same shall be thoroughly insulated. For every violation of any of the provisions of this section the party offending shall, upon conviction thereof, be punished by a fine of not less than $10 nor more than $40. This regulation shall not apply to uninsulated wire specially authorized by Congress."

And then, also, section 220 of the Building Regulations, as follows:

"Sec. 220, Wires.—a. Service wires must have an approved rubber insulating covering. Line wires, other than services, must have an approved weather-proof or rubber insulating covering. All tie wires must have an insulation equal to that of the conductors they confine."

An expert electrician testified for plaintiff substantially as follows: He visited the locality on September 15, 1902, and examined the wires. The wires were entirely bare for 10 or 12

inches on either side of the glass insulators on the bar to which they were attached. At other places the insulation was what he called ragged, with strips of it hanging from the wires. The wires were of copper, about $^3/_{16}$ of an inch in diameter, and about 18 inches apart.

Weather-proof insulation is made of hemp or cotton yarn, saturated with tar or asphaltum, and sometimes with the addition of a rubber solution. The tar preserved the hemp or cotton from the elements to a certain extent. The elements gradually caused deterioration; and he thought there had been a gradual decay in this instance. Weather-proof wires, in this climate, last ten or twelve years, as a rule, and then deteriorate. In his opinion, if a person had a hand on a well-covered wire and his body on the tree, it would take a voltage of over 2,000 to pass through the insulation and give a shock. Could not say how high a voltage must be to burn a finger off. On cross-examination he said that on the supposition that wires conveying 2,000 volts had been insulated for six or seven years, if a person had hold of both wires there was a possibility that he might get a shock. At the point of contact with the hand, with a voltage of 2,000, there would be a burn on the insulation, provided there was a considerable leak.

Other testimony tended to show. that the original insulation of the wires had been hanging in strips at different places along the wires before the day of the accident.

The evidence on behalf of the defendant will be given more at length.

Lindley E. Sinclair testified that he was the general superintendent of the defendant company, and had held that position for seven years. It was his duty to see to the construction and insulation of all the apparatus, that the customers get the proper service, that all extensions are made, and that the plant is maintained in proper manner. He had been on the vacant lot described in the declaration probably a couple of dozen times altogether in the seven years of his connection with the defendant company. That company absorbed the United States Electric Lighting Company. When witness became superintendent he

found the service already installed over the wires described in the declaration. The wires and the pole on which they are now strung were then there. Those wires are line wires, which is a main line wire from which other service wires branch off. A service wire is a wire supplying a given house and derives its power from the primary or line wires. The wires described in the declaration do not go into Mr. Waggaman's house or into anybody's house, but are the primary wires which supply the house through step-down transformers, which convert the current from 2,000 volts on these primary wires to 110 volts that are used over the service wires inside the buildings. The wires described transmitted what was supposed to be a current of 2,000 volts at the time of the accident. That voltage is necessary in order to lighting of the district that they are put there to light with the system now in use. Of course, the lighting could be done in many different ways. The system in use is the same that the defendant company has through the entire territory west of Rock Creek and in the suburbs inside of the fire limits east of Rock Creek. Different cities have different voltages. In some of the larger cities they transmit the voltage from the main power house out to the suburbs up as high as 4,000 and 6,000 volts. Different systems take different pressures, according to the territory which is to be covered. The system used by the defendant company west of Rock Creek, in which it is necessary to use the 2,000 volts in order to do the work, was in general use throughout the country at the time of the plaintiff's accident. The service wire inside of Mr. Waggaman's house connected with these wires about 100 feet. They pass along the pole in the rear of his property, and within 2 feet of his house there is another pole in which the transformer is placed. This secondary or service wire carried about 100 to 110 volts. It is covered with rubber where it enters the building. At the time of the accident the primary wires were insulated with weather-proof insulation, which is a cotton braid put on the wire, and then the wire is saturated with a compound composed principally of asphaltum. Weather-proof insulation is a term well known to the trade. The wire is bought already insulated, and

the insulation is not much more than $1/16$ of an inch.  Having
qualified as an expert in such matters, the witness said that
weather-proof insulation has been in use for many years.  He
did not consider weather-proof insulation any protection on a
high voltage wire to a person coming in contact with it, because
the material of which the insulation is composed is not a suf-
ficient insulator for the voltage for which it is used.  He did
not think there would be any difference about taking a wire
that is carrying 2,000 volts where a person took hold
of it, whether it was insulated with weather-proof in-
sulation or not.  It would not make much difference if
put on a wire carrying a light voltage, because a person
would not get a severe shock without it.  Anybody could
handle with safety a wire transmitting from 220 to 250 volts,
even if it were uninsulated.  An uninsulated wire, if carrying
500 volts, would give a pretty bad shaking up.  At the time of
the accident all the companies that the witness knew about used
weather-insulated wire with the exception of companies that
were going into the higher voltages, who have stopped using it
entirely, and are using nothing but bare wires.  They recognize
the fact that weather-proof insulation is of no use as an insulator,
and they have stopped using it entirely.  He does not consider
weather-proof insulation any protection on a high-voltage wire.
He thought that it would not be practicable to insulate primary
wires with rubber insulation, because rubber will not last in
weather.  If exposed to the weather it has a very short life.  It
would deteriorate so rapidly that the wire would have to be taken
down and replaced so frequently that it would be impracticable
on account of the great expense it would entail on the company,
and also the customers would not permit it without great com-
plaint, because putting them out of service while replacing the
wires.  He did not know if it has ever been tried how long rub-
ber insulation will last, but thought it might last for a year.
It is very expensive, and because of this and frequent removal
of wires he considered it impracticable to cover these heavy-
voltage wires with rubber, and no company that witness knew of
had attempted it.  He did not know of any safe, practicable in-

sulation for these heavy-voltage wires where they were used in the weather. Weather-proof insulation is used in the defendant's underground conduits. On such systems as those that transmit the current between Niagara Falls and Buffalo, where the voltage is 20,000 volts, they do not use any insulation at all. He thought that on wires carrying 2,000 volts they are still using the weather-proof insulation. He thought that, if a person standing on a pole would take hold of one of the wires, that he would not receive a shock. In order to complete the circuit you have to get hold of, or come in contact, with both poles of the machine that is generating the electric current. In order to complete the circuit for a man on a pole, he has to come in contact either with the two wires, so that the current can pass through his body, or he has to come in contact with one wire and touch the ground,—the ground being more or less of a conductor. His conclusion was that, if a person had both of his hands burned, he must have had hold of both wires. He could reach out and take hold of one and not receive any shock, but by taking hold with the other hand he would get a shock right through the body.

On cross-examination of the witness, an agreement was first had that the old Potomac Electric Company was incorporated in 1891 and the defendant in 1896. When the witness became connected with the defendant in 1896, it was maintaining the pole and wires described in the declaration for the purpose of supplying electricity for the neighborhood. In September, 1902, Waggaman's house was supplied with these wires, as was also witness's own house at 3318 O street northwest. There was also additional light supplied through a transformer to an alley. The voltage was 2,000 volts. The voltage necessary to supply each one of these houses and the little electric light was 110 volts. Nothing else was maintained by the main wires. The wires in question might have been No. 8 or No. 6 wires. The difference is very slight. They got their electricity from the power house at Thirty-third and Water streets. They do not go directly to the main line, but go over the roof of Emrich's meat house, pass down and go into our conduit. They contain the

same voltage as the main line; that is the force sent out from the defendant's power house. The wires are all charged alike. On other lines supplied with 2,000 voltage the number of houses supplied go into the hundreds, and they are all scattered. The defendant company has one line that leads from the power house and goes to Cabin John bridge and supplies the hotels and houses along that line and some street lights; another line goes down across the Aqueduct bridge; another line goes straight up the Tenleytown road and supplies the Naval Observatory and places in that neighborhood; another line goes up and supplies all Cleveland park and clear up to Somerset Heights, besides two or three hundred street lights. The circuits lead out from the power house. These are line wires. The voltage of each line is the same, 2,000 volts, and the pressure has nothing to do with the number of houses that are on any one line. Whether it is one house or a hundred the same pressure is used. You could tap the main line anywhere and take off a hundred volts by putting on a transformer. We do that for every house. Every connection we make from the main line is made through a transformer. There is no transformer for this line we are speaking of, where the accident occurred. It taps the main line there and takes off the full force.

Joseph R. Curtis, for the defendant, testified that he was a salesman in the National Electric Supply Company, and an expert electrician, having had charge of electrical construction, installation, machinery, electric wiring, etc. He testified substantially as had Sinclair as to the nature of weather-proof insulation. He said that a high-voltage wire carrying 2,000 volts insulated with weather-proof insulation woud afford no material protection to a person having hold of the wire, but it would be impossible to say that it would be no protection. He would not consider it safe to take hold of a weather-proof wire carrying 2,000 volts. He thought that the weather-proof insulation was the survival of old times. Rubber insulation is protective insulation to a person coming in contact with the wire, provided it is of good composition, has good rubber in it, and is sufficiently thick. He would not say that an insulation from

$3/32$ to $1/4$ inch thick of rubber would be required on a wire carrying a 2,000 voltage in order to be reasonably complete protection to a person handling the wire or coming in contact with it. It would be impracticable, owing to the cost, to use the rubber insulation on trunk or primary wires carrying a voltage of 2,000. The cost would be excessive. On cross-examination he said it is hard to say what is no protection. These things cannot be determined as you would a mathematical problem, but he thought it very unsafe to touch a weather-proof wire carrying 2,000 volts. Had never seen what the effect was upon a person touching a wire transmitting a voltage of 2,000 and containing good weather-proof insulation, but thought it would be a very severe shock and that the person so touching the wire would, under such conditions, have his fingers burned. He was then asked the following question: "If it were desired to supply two residences with electric lights, and to light one incandescent light, what voltage would be necessary?" Defendant objected to the question, and it was not permitted.

Philander Betts, an electrical engineer employed by the defendant, said that in running overhead circuits it is customary to use rubber-covered wire, or rather weather-proof wire, with the exception of the old-fashioned arc circuits. It used to be the practice to use rubber-covered wires on those circuits, but experience with those circuits has shown that the rubber-covered wire deteriorated in such a way that within four or five years the braid on the outside of the wire was almost entirely gone and very much of the rubber had fallen off of the wire. In a situation where the wire was subjected to no specially bad conditions half of the rubber had actually fallen off the wire in eight years, and in a situation where the wire had not been subjected to abrasion in trees. The weather-proof insulation has been used practically from the beginning for all line wires. The first line wires were run at very low voltages with the original Edison system, in which the voltage never exceeded about 225 to 230 volts, the ordinary voltage being 110. When the electric railways were first constructed the ordinary wire in use at that time was employed for feeding these systems, which was

then the weather-proof wire; and when, a little later, the high-tension systems, higher-voltage systems, 1,000, and then later again 2,000, volts, came into use, naturally the ordinary weather-proof wire was employed; so that the question as to whether that insulation was proper for such a system never came up. It was the ordinary wire in use for all purposes, and was employed successively for one thing and then another. It came into common use in that way, and has continued that way. When asked what he would say about the efficacy of weather-proof insulation upon high-tension wires carrying 2,000 volts as to preventing a person taking hold of it from receiving a shock, he replied: "In answering that question it must be borne in mind that there is no perfect insulation, and there is no absolute perfect conductor. An insulation may be good in some conditions. It may be bad, very bad, under other conditions. I have seen good weather-proof wire from which, when out in the rain, I have been able to get a shock by taking hold of the outside of a well-insulated weather-proof wire carrying 100 volts. At the same time I have stood on the street on a railroad track and taken hold with both hands of weather-proof wires carrying 500 volts, in perfectly dry weather, and have not experienced any shock whatever. That has been my own experience. With currents of 1,000 volts, with an absolutely dry weather-proof wire, and in a situation where two persons could not possibly form part of a circuit, no shock could be obtained; but with 2,000 volts, I would not want to risk taking hold of 1,000-volt wire, much less of 2,000-volt wires. The fact that that insulation has been used, as I say, is a survival of conditions which were applicable originally for what they were intended for."

The witness said that where insulation was dropping off the practice was not to replace it with new insulation. It would not be practicable to insulate the primary or line wires with rubber insulation of the kind and character that would be a perfect protection against shocks by coming in contact with the wire. He said that, if a person would touch a wire with good weather-proof insulation, carrying a voltage of 2,000, he would certainly get a shock. If a person touched a bare wire containing a

voltage of 2,000 he would get a shock, and a shock and a burn is the same thing.

Albert O. Stearns, for the defendant, testified that he was foreman for the defendant, and had been for five years. His duty was to supervise all the work of installation, maintenance, and repairs, which included the putting up of wires and hanging them and putting up poles. He had been on the lot where the pole described in the declaration is located three or four times, covering a period of three or four years. Was first there about seven years ago, and since has been there once or twice a year, possibly. He testified also, as did the others, regarding the insulation and its effect. He said that the current in the wires described is an alternating current. On other lines there are 500-volt currents which are direct, and there are such things as lighting wires that are direct, but no high-voltage direct. The current on the wires of the defendant company that extend from the country, that is, Tenleytown, Eckington, Cabin John, and Anacostia, is an alternating current. In the city proper the defendant has a direct current; that is, in conduits. He examined the place of accident prior to the accident, and found the wires all in good shape. He noticed some of the insulation hanging from the wire after the accident. He said: "We never pay any attention to the insulation."

J. W. Stanbury, for the defendant, testified that he was an inspector for the defendant, and had been so employed for five years. He inspected all the lights, lines, and poles. He was familiar with the pole and wires on the vacant lot. He was there a number of times. Was there once a month or once in two months. Would examine the poles to see if they were sound. He saw that the wires were up like other wires. Could see no difference. Did not look at the wires except to see that they were in proper shape. Never paid any attention to the insulation at all.

Louis D. Bliss, called for the plaintiff in rebuttal, testified that he was an electrical engineer, and had had experience, etc. He also described weather-proof insulation. Said it was difficult to state how thorough the insulation would be on a wire trans-

mitting a voltage of 2,000. The insulation resistance becomes less and less as the length of the wire increases. You cannot state it as an abstract quantity. The longer the time the less would be the insulating qualities of the line as a whole. Generally speaking, if the best of this weather-proof insulation is used on a wire transmitting a voltage of 2,000 a person taking hold of a wire so insulated should not receive any shock if the insulation was new and of good quality. On cross-examination he said: In very warm weather it would deteriorate very rapidly. High-tension wires are usually insulated with weather-proof insulation,—that is, up to 2,000 volts; but above that they are usually mounted bare. Rubber insulation can be employed, but it is rarely done outside. The expense would not render it justifiable. Besides, it deteriorates rapidly in the weather. No accurate estimate could be made as to how long rubber insulation used for outside purposes would last.

*Mr. Charles Cowles Tucker, Mr. J. Miller Kenyon,* and *Mr. Edward S. Bailey* for the appellant.

*Mr. Charles A. Douglass (M. J. J. Darlington, Mr. C. C. Cole,* and *Mr. R. S. Huidekoper* being with him on the brief) for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

Some time may be saved and possible confusion avoided by resolving the twenty-four assignments of error into comparatively a few propositions, which will now be considered.

1. It was error not to permit the plaintiff to answer a question intended to elicit the fact that he thought or believed the wires with which he came in contact were old and disused. Evidence had been introduced tending to show that the wires had been in position for years, and that their original weather-proof insulation was hanging in strips; also, that there was nothing nearby to indicate that they constituted a lighting circuit, and

that, in fact, they were used to furnish light to two houses only, some distance away. It also tended to show that, when seen just before falling, plaintiff had one foot supported by the pole and his hand upon the wire. This evidence was relevant to the issue of the negligence of one party and the contributory negligence of the other. Aside from the fact that plaintiff may have had the right to presume that the wires conformed to the requirements of the municipal regulation, his knowledge or belief in respect of their actual use at the time was a material circumstance for the consideration of the jury in determining the question of his contributory negligence.

2. It is doubtful if evidence of the general custom of other electric lighting companies throughout the country to use uncovered circuit or primary wires of high voltage would be admissible under any circumstances. *McDermott* v. *Severe,* 25. App. D. C. 276, 284, and cases cited. But to admit evidence of such a custom in contravention of the express prohibition of the municipal regulation was clearly erroneous. *The Shetland* v. *Johnson,* 21 App. D. C. 416, 421; *Richelieu & O. Nav. Co.* v. *Boston Marine Ins. Co.* 136 U. S. 408, 435, 34 L. ed. 398, 408, 10 Sup. Ct. Rep. 934.

3. There having been evidence tending to show that the wires which caused the damage were connected directly with the central power station, and carried an electric current of about 2,000 volts, and that their sole use was to light two houses only and maintain a small incandescent light in an alley adjacent thereto, the plaintiff, in cross-examination of defendant's expert witness, asked the following question: "If it were desired to supply two residences with electric lights and to light one incandescent lamp, what voltage would be necessary?"

The defendant objecting, the witness was not permitted to answer, and the plaintiff took an exception. Under our view of the effect of the prohibitory regulation, hereafter to be stated, the evidence sought to be elicited may not have been important; but in view of the wide range of evidence that had been permitted to the defendant, in respect of negligence generally and of the unreasonableness of that regulation, we think it was ma-

terial and important, and that its exclusion was error. If the answer would have disclosed the fact, which other evidence tended to indicate, that a very low voltage was all that was necessary for the purposes named, and that the dangerous current carried had to be reduced by a transformer before its introduction into the houses, by means of what are called service wires tapping the circuit or primary wires, it would have developed a material fact for the consideration of the jury in determining whether the defendant had not been guilty of negligence in maintaining the dangerous voltage of the primary wires, regardless of the effect of any regulation.

4. The question of controlling importance raised by the errors assigned relates to the effect to be given to the municipal regulation requiring wires bearing currents dangerous to life to be thoroughly insulated, in determining the negligence of the defendant.

From the numerous special instructions relating thereto, the giving or refusing of which was excepted to by the plaintiff, we have selected several which seem sufficient for all necessary purposes.

At the request of the defendant the following were given in charge to the jury:

"5. The jury are instructed that, even if they should find from the evidence that it would have been useful and practicable to have insulated said wires, as provided in the ordinance in evidence, and that the defendant failed to do this, it would not follow, as a necessary consequence, that the defendant was guilty of negligence, but it would be a fact which the jury might consider, with the other evidence, in determining whether the defendant was negligent.

"7. The jury are instructed that, whether the stringing or maintaining of the wires, as shown in the evidence, or permitting the insulation to become partially worn therefrom, was negligence on the part of the defendant, is a question for them. And, if they shall find that a reasonably prudent man would have done as defendant did, under all the circumstances of the case, then

they should find that the defendant was not negligent, and their verdict should be for the defendant.

"10. The jury are further instructed that, even though they should find from the evidence that the defendant was negligent in one or both of the particulars mentioned in the seventh instruction, they should still find for the defendant, unless they shall also find from the evidence that a reasonably prudent man, situated as the defendant was and having only the knowledge that it had, would have anticipated that someone would climb the tree and, in that way, come in contact with the wire."

The following, asked by the plaintiff, were refused:

"2. If the jury believe from the evidence that at the time the plaintiff was injured the defendant company was maintaining or using an overhead electric wire, or overhead electric wires, within the District of Columbia, conveying or transmitting a current or voltage of electricity dangerous to life, and that said wire or wires were not thoroughly insulated at the time, and that, as a result of the maintenance or use of the same, or any of them, in said condition, the infant plaintiff was injured, then they must find the defendant was guilty of negligence, and their verdict must be for the plaintiff, unless they further find that the plaintiff was himself guilty of negligence which contributed to his injury.

"4. If the jury find from the evidence that the electric wire or wires with which the plaintiff came in contact, and, as a result, was injured, was, or were, not properly or thoroughly insulated as required by the municipal regulations in evidence, the law authorizes you to infer negligence on the part of the defendant as one of the facts established by the proof.

"13. The jury are instructed that, if they believe from the evidence that the defendant could have insulated the wires in question so as to render them reasonably safe to human life, the defendant was not excused from so doing by the mere fact that it would have been expensive to do so, or that it would have required frequent reinsulation, or the frequent stringing of new insulated wires by reason of the effect of the elements on the insulation."

The general charge, which was also excepted to, followed the lines indicated by the foregoing and other similar instructions that were given or refused.

We are of the opinion that the court erred in granting the several instructions for the defendant, and in not granting the plaintiff's that is numbered 2.

Those given for the defendant were founded chiefly upon the evidence, recited in the preliminary statement, tending to show the imperfections and general inefficiency of the ordinary weather-proof insulation for high-tension wires; the impracticability, on account of excessive cost and frequent interruptions of service in making changes, and the consequent invalidity of the municipal regulation for unreasonableness; and, also, the general custom of electric lighting companies throughout the country to abandon it and use bare wires where the lines carry a high voltage.

We have already said that this evidence of custom in contravention of the requirements of a positive regulation, having all the authority of a statute, was inadmissible. As regards that going to show the unreasonableness of the regulation, we are of the opinion that it fell far short of the weight necessary to justify a court in declaring the invalidity of a regulation enacted by competent authority for the better protection of life and property. Aside from the general insufficiency of this evidence, which brought it within the rule correctly expressed in the thirteenth instruction of the plaintiff that was refused, defendant's own evidence tended to show that the high voltage of the wires was unnecessary for the purposes to which they were limited in use. Moreover, the wires were within the fire limits, wherein, it would seem, from its general legislation on the subject, Congress intended that all line or primary wires should be carried in underground circuits. The wires in question emerged from a conduit through which they connected with the power house, and no reason was given why they could not have been wholly carried in conduits, nor was any permit shown for carrying them overhead. Again, it appeared from the testimony of defendant's witness, Stearns, that in what he called "the city proper," the

defendant's wires carry a direct current in underground conduits the voltage of which is generally 500 volts, while the current in the wires in question was an alternating current similar to that used in lines in the adjacent country (both in the District and Maryland), and of high voltage. The term "city proper" is commonly understood to apply to that part of the city of Washington embraced within the established fire limits. A great deal of this testimony may have been admissible for the express purpose of enabling the defendant to make its point in respect of the invalidity of the regulation, but, with all of it before him, the court should have charged the jury that, as matter of law, it was insufficient to effect that purpose.

The regulation aforesaid, being a proper and reasonable exercise of the police power conferred by Congress upon the District Commissioners, plainly imposed a duty upon the defendant for the benefit of the public, considered, also, as composed of individual persons. Each person specially injured by the breach of the duty is entitled to an action for the recovery of his individual compensation. *Hayes* v. *Michigan C. R. Co.* 111 U. S. 228, 240, 28 L. ed. 410, 415, 4 Sup. Ct. Rep. 369.

It is not essential to this right of action that it be expressly conferred by the statute or regulation. It follows from the creation of the duty and a breach thereof directly resulting in damage. The duty and the right are correlative. *Lindsey* v. *Pennsylvania R. Co.* (present term) *post,* 503.

Nor is this right of action affected by the fact that the same regulation imposes a penalty for its violation, recoverable in a criminal action, there being no indication whatever of an intention to make that remedy exclusive. It is a cumulative remedy merely, provided for the compensation of the breach of a duty due to the public also, considered as a municipal body, and which, to exist, must be expressly given. *Union P. R. Co.* v. *McDonald,* 152 U. S. 262, 267, 38 L. ed. 434, 437, 14 Sup. Ct. Rep. 619; *Couch* v. *Steel,* 3 El. & Bl. 402, 412; *Parker* v. *Barnard,* 135 Mass. 116, 120, 46 Am. Rep. 450; *Correll* v. *Burlington, C. R. & M. River R. Co.* 38 Iowa, 120, 122, 18 Am. Rep. 22; *Queen* v. *Dayton Coal & I. Co.* 95 Tenn. 458, 462, 30

L. R. A. 82, 49 Am. St. Rep. 935, 32 S. W. 460; *Pauley* v. *Steam Gauge & Lantern Co.* 131 N. Y. 90, 95, 15 L. R. A. 194, 29 N. E. 999; *Willy* v. *Mulledy,* 78 N. Y. 310, 314, 34 Am. Rep. 536. Had this public remedy been enforced vigorously and persistently from the time it was given, it is probable that there would have been no occasion for resort to the individual remedy.

In view of the facts in evidence in this case, which are substantially undisputed, we deem it wholly unnecessary to enter upon a discussion of the apparent conflict of State decisions, in respect of whether the breach of a duty imposed by statute constitutes negligence in all cases, negligence *per se* as it is sometimes called, or a presumption of negligence, or is merely a circumstance from which the jury may or may not infer negligence.

If the mere omission to perform the duty is the only negligence proved against a defendant, and the omission of that duty did not proximately contribute to the plaintiff's injury, it will not constitute negligence in the legal sense; that is to say, negligence justifying a recovery of damages therefor. Shearm. & Redf. Neg. 5th ed. sec. 467.

In special and particular cases it may be sufficient to raise a presumption of negligence which may be overcome, or it may constitute but a circumstance of more or less weight, among others, from which the jury would be authorized to infer negligence. However this may be in respect of particular kinds of duties and the special circumstances of cases, if the undisputed evidence shows, or if the jury can from conflicting evidence fairly find, that, without contributory negligence on the part of the plaintiff, the neglect directly resulted in, or was the proximate cause of his injury, negligence exists, as matter of law, and the jury should be so charged.

We think that this doctrine is firmly established by the Supreme Court of the United States in the following cases, notwithstanding some expressions, in one or more of them, occasioned by the character of the statutory duties and the evidence involved; *Hayes* v. *Michigan C. R. Co.* 111 U. S. 228, 28 L. ed. 410, 4 Sup. Ct. Rep. 369; *Grand Trunk R. Co.* v. *Ives,* 144 U. S. 408,

36 L. ed. 485, 12 Sup. Ct. Rep. 679; *Union P. R. Co.* v. *Mc-Donald,* 152 U. S. 262, 267, 282, 38 L. ed. 434, 437, 443, 14 Sup. Ct. Rep. 619; *Deserant* v. *Cerillos Coal R. Co.* 178 U. S. 409, 420, 44 L. ed. 1127, 1133, 20 Sup. Ct. Rep. 967.

In *Union P. R. Co.* v. *McDonald,* a young lad, in running along a path near an unfenced slack pit, fell into it and was badly burned. The court, among others, gave this charge: "The law made it the duty of the defendant to fence its slack pit, and, if it did not do so, and as a result of its negligence in failing to comply with its legal duty in this regard, the plaintiff received the injuries complained of, the defendant is liable." In affirming the judgment for the plaintiff, Mr. Justice Harlan, who delivered the opinion, said: "As the facts were undisputed, the question of liability upon the ground of negligence was one of law, and, as the facts showed negligence by the railroad company, which was the primary, substantial cause of the injury complained of, it was not error in the court to so declare."

In *Deserant* v. *Cerillos Coal R. Co. supra,* the action was founded on the neglect of the defendant to comply with an act of Congress relating to the proper ventilation of coal mines.

Discussing certain instructions of the defendant, for the granting of which the judgment for the defendant was reversed, Mr. Justice McKenna, who delivered the opinion, used the following language, which is specially applicable to the instructions given for the defendant in this case: "We think the instructions numbered 1, 6, and 11, given at the request of the defendant, ignored the obligations of the act of Congress * * * making the duty of the mine owner relative, not absolute, and its test what a reasonable person would do, instead of making the test and measure of duty the command of the statute. The act of Congress does not give to mine owners the privilege of reasoning on the sufficiency of appliances for ventilation, or leave to their judgment the amount of ventilation that is sufficient for the protection of miners. It prescribes the amount of ventilation to be not less than 55 cubic feet per second; it prescribes the machinery to be adequate to force that amount of air through the mine to the face of every work-

ing place.    Nor does it allow standing gas.    It prescribes, on
the contrary, that the mine shall be kept clear of standing gas.
This is an imperative duty, and the consequence of neglecting
it cannot be excused because some workman may disregard in-
structions.    Congress has prescribed that duty, and it cannot
be omitted, and the lives of the miners committed to the chance
that the care or duty of someone else will counteract the neglect
and disregard of the legislative mandate."

The second instruction asked by the plaintiff was in accord
with this doctrine, was strictly applicable to the relevant facts in
evidence, and ought to have been given to the jury.    With this
instruction given, others asked by the plaintiff were unnecessary,
and would have tended to confuse the jury.    They were, in
fact, only prayed in the event of the refusal of the other, and out
of abundant caution.

5. On the question of the plaintiff's contributory negligence,
the court gave the following instruction at the request of the
defendant:

"14. If the jury shall find from the evidence that the *plain-
tiff* saw the wires and touched one or both of them intentionally,
he cannot recover and the verdict should be for the defendant.

"15. If the jury shall find from the evidence that the plaintiff
might, by the use of ordinary prudence, have seen the wires
and avoided touching them, *while in the tree or on the pole,* he
cannot recover, and the verdict should be for the defendant.

"16. If the jury shall find, from the evidence, that the *plain-
tiff* saw and noticed the wires, on the day of his injury, before
or after going into the tree, it was incumbent upon him to look
out for them, so as not to come in contact with them, and if he
did not do so the verdict should be for the defendant."

Bearing in mind the requirements of the regulation as regards
the thorough insulation of wires "transmitting a current of
voltage dangerous to life," as well as the actual uses of the wires
at and before the time of the injury, we are of the opinion that
the foregoing instructions did not correctly state the law ap-
plicable to the facts in evidence.

Plaintiff was entitled to the protection which would be af-

forded by compliance with the regulation, and had a right to presume that it had been complied with, or that the wires were not used to convey a dangerous current. *Union P. R. Co.* v. *McDonald,* 152 U. S. 262, 267, 38 L. ed. 434, 437, 14 Sup. Ct. Rep. 619.

Consequently, the sixth special instruction asked by the plaintiff should have been given. It reads:

"6. The jury are instructed that the plaintiff had a right to assume that the wires of the defendant passing through the branches of the tree in which he was climbing at the time he was injured were insulated as required by the municipal ordinances in evidence, unless they shall further find that he knew, or should have known, at the time, that the insulation on said wires, or either of them, was defective, and that said wire or wires was or were being used for the purpose of transmitting or conveying a current of electricity." For the errors pointed out the judgment will be reversed with costs, and the cause remanded, with direction to set aside the verdict and grant a new trial.                      *Reversed.*