JOSEPHINE N. TYNON, APPELLEE, V. MISSOURI PACIFIC RAIL-
WAY COMPANY, APPELLANT.

FILED NOVEMBER 17, 1917. No. 19737.

Railroads: ACCIDENT AT CROSSING: INSUFFICIENCY OF EVIDENCE. Evidence
examined, its substance stated in the opinion, and found insufficient
to sustain the verdict.

APPEAL from the district court for Nemaha county:
JOHN B. RAPER, JUDGE. Reversed.

J. A. C. Kennedy, Kelligar & Ferneau and Philip E.
Horan, for appellant.

Lambert & Armstrong and R. F. Neal, contra.

HAMER, J.

This action was brought by Josephine N. Tynon, plaintiff
and appellee, to recover damages because of a personal in-
jury claimed by her to have been sustained on account of
the negligence of the defendant railway company. She
had a verdict and judgment for $1,029.

She was in a buggy going from her home at Peru to
Auburn, at which latter place she expected to take a
train for Omaha where she was engaged as a teacher.
The day was January 4, 1914. She was in an ordinary
top buggy drawn by a team of horses which were driven
by a Dr. Vance. The accident happened just east of
Auburn at what is known as the "Good Road" or
"Rock Road" crossing of the railroad track. It is
claimed on behalf of the plaintiff that she looked and
listened, but did not see or hear the approaching train,
and was not aware of its approach until about the in-
stant before the engine struck the buggy, and that the en-
gineer in charge of the train saw the team and buggy ap-
proaching the track and knew that a collision was proba-
ble, and also that he was made aware of the danger when
at a sufficient distance from the team and buggy to have
prevented the collision by giving an alarm whistle, and

that if he had done so Dr. Vance, the man driving the team, could have stopped the same before the horses went upon the track. The plaintiff claims that the engineer failed to do anything to avoid the collision. This is the chief issue in the case. It should be stated that the defendant's train usually reached Auburn at 3 o'clock in the afternoon, but that the schedule had just been changed, and on that particular day the train was due to arrive at 2:30. The plaintiff appears to have known of the previous time fixed for the arrival of the train, but was not aware of the change in the schedule. She therefore did not know that the train was about due at the crossing. It is claimed by counsel for defendant that one of the horses in the team was very much afraid of trains and could not be driven anywhere near an engine, and that the witness Ivers had warned Dr. Vance of this fact and against hitching the team near the depot. It is claimed on behalf of the plaintiff that this fact becomes material on the disputed issue as to whether or not the bell was ringing, as is claimed by the defendant.

The day was cloudy and cold and with a wind from the north. The curtains of the top buggy prevented the occupants from seeing out except in front of them. The team traveled along at a rate estimated from four to six miles an hour. There is testimony that shortly before reaching the crossing the plaintiff pulled aside the top of the curtain and looked to the southeast along the track for the purpose of discovering whether there was a train coming, and she saw none. There is also testimony that Dr. Vance leaned forward and looked out of the buggy, but did not see the train. There appears to have been a down-hill grade on the railroad from a point something over a mile south of the "Good Road" crossing to a point beyond said crossing and clear to the depot at Auburn. On behalf of the plaintiff there is evidence that the train came around the curve at the brickyard something more than 40 miles an hour, but that the steam was then shut off and the train was left to drift. There is a conflict in the evidence as to whether the train was traveling 20 or 40 miles an hour. The engineer fixed the rate of speed at 20 to 25 miles an hour. It

appears to be conceded on both sides that at a short distance east of the track the team slowed down from a jog trot to a walk and continued this walk until just before the collision. The engineer of the train testified that he noticed the team at a distance of 70 or 80 feet from the railroad track and just after it had crossed the little bridge, which is just east of the crossing, and that he observed the slowing down of the team, and placed the distance of the team from the track at from 12 to 15 feet just before the accident. The engineer testifies he did not whistle or give the alarm as the train got close to the crossing, because he thought the team would stop before going on the track; that he had the team under observation from the time it slackened its speed until the collision occurred; that he could not see the occupants of the buggy, and only saw the slacking of the team, and that caused him to think that the team was about to stop. The slowing down of the team appears to have occurred from 50 to 75 feet from the track, and from this place the team continued to travel at a slow walk until just the instant before the collision occurred, when the horses made a jump. The horses were thrown high into the air and one was instantly killed. They were both thrown a considerable distance from the railroad track. The buggy lodged on the pilot, and the plaintiff and Dr. Vance remained in the buggy and were carried along on the pilot about 500 feet.

Counsel for the plaintiff in their brief seem to concede that she may have been negligent, but say that if she was negligent "her negligence consisted in not looking and listening sufficiently well;" that "she looked and listened, but did not see or hear the train," and "did not hear the whistle that was blown as the train was rounding the curve at the brickyard, nor the other whistles" which were blown, and did not hear the ringing of the bell, if any bell was rung. Plaintiff's counsel suggest in their brief that plaintiff failed to hear the whistles because the sound was probably drowned by the noise of the team and buggy traveling over the "Good Road," which was built out of ground rock, and may have failed to hear the roar of the train or the ringing of the

bell for. the same reason.  The argument is also made that if the bell had been ringing the horses would have heard it, and that it was a skittish team.  Attention is called to the fact that the plaintiff had reason to believe that the train was not due for half an hour, and that this fact may have somewhat affected her diligence in looking for the train. The argument in the brief is very candid, because it concedes that, "if the plaintiff was guilty of any negligence, it consisted in the manner in which she looked and listened."

The railroad extended from the south toward the north. The train was running north.  The road on which the team and the buggy were approaching extended from the east toward the west across the railroad track, and the buggy was going from the east toward the west.  By looking out of the buggy in a southerly or southeasterly direction the train might have been seen approaching the point where the collision occurred.  That the occupants of the buggy, including the plaintiff, did not carefully look and listen is apparent from the testimony of the witnesses.  If they had done so, this accident would probably never have happened.  This brings us up to the consideration of the doctrine of "the last clear chance."  Of course, if the engineer of the train saw the team and buggy approaching the crossing and saw that there would probably be a collision if he did not stop, then it was his duty to warn the occupants of the buggy of the danger by blowing the whistle, or in any way possible, and to stop the train if he could.

In *Dailey v. Burlington & M. R. R. Co.,* 58 Neb. 396, this court held:  "Notwithstanding a party has negligently placed himself in a position wherein he is exposed to injury, if another, after discovery of such condition, inflicts the injury by reason of failure to exercise ordinary care to avoid it, the former may have an action for damages against the latter."  In the same case it is said in the body of the opinion:  "It is a well-established doctrine that, notwithstanding a person may have so placed himself as to be liable to injury, yet if another, after knowledge of the fact, inflict injury because of the failure of the latter to exercise ordinary care to avoid it, the former may recover damages.

*Union P. R. Co. v. Mertes,* 35 Neb. 204; *Omaha Street R. Co. v. Martin,* 48 Neb. 65; *Brotherton v. Manhattan Beach Improvement Co.,* 48 Neb. 563." The foregoing authorities seem to sustain the position taken.

In *Zitnik v. Union P. R. Co.,* 91 Neb. 679, this court held: "The rule of 'the last clear chance' implies that the one charged with negligence knew the person injured was in a place of danger and negligently failed to avoid injuring him, but his testimony that he did not have such knowledge is not conclusive. Such knowledge may be shown by proof that the person injured was in a situation of imminent danger and so situated that the one injuring him, if he used his senses as human beings ordinarily do, must have known the danger."

This brings us to the consideration of conditions immediately preceding the collision.

Dr. V. V. Vance, a witness called for the plaintiff and who drove the team, testified that he thought he was back about 100 feet when he looked down the railroad track for the last time and could see down there for 200 yards, that after he had passed over the bridge at a slow trot he came onto the slight incline up to the railroad track, and that then the team slowed up. Clyde Harper, called as a witness for the plaintiff, testified that he thought the team slowed up as it reached the railroad track. C. B. Petticrew, called for the defendant, testified that it seemed to him that at a point about 50 feet from the track, where the incline began, the team checked up, and it looked to him from where he stood that they were urged across the track, and at the moment they got on the track the locomotive hit the buggy, throwing the team toward the depot.

There was evidence tending to show that the railroad track at the crossing was about five feet higher than the surrounding country; also, that the "Good Road" is elevated about 3½ feet above the surrounding land, and that this road approaches the track of the railroad on an upgrade about 70 feet long; also, that the surface of the ground is not uneven, and that the distance from the "Good Road" crossing south to the first whistling post is about a quarter

of a mile. Dan Pardue, George Stevens, and E. M. Bogart, witnesses called on behalf of the defendant, testified that the buggy curtains were closed, and that the team was trotting, and that the train was in sight, and that there was nothing to obstruct the view of the persons in the buggy. Roy Shanks, called on behalf of the plaintiff, testified that the train was in plain sight of the buggy; that he first saw the buggy about 200 or 250 yards from the crossing; that there was nothing to prevent the occupants of the buggy from seeing the train. Dr. Vance further testified that it was cloudy, but that the cloudiness did not interfere with the view of the occupants of the buggy, and that there was nothing between them and the train to obstruct their view. Art Bamber, called for the plaintiff, testified that he did not hear the train whistle until it reached the crossing; that when he first saw the train it was about 100 yards from the crossing; that when he heard the train whistle at the mile post it gave a long whistle.

The plaintiff testified that Dr. Vance was driving the team; that when they tried to ascertain whether there was a train on the track she pulled down the curtains and looked down the track, but that she never saw or heard anything; that when she looked she reported to Dr. Vance that the track was clear. She also testified that she did not know whether she could have seen the train if she had looked, but that there was nothing to obstruct the view. Dr. Vance further testified that he asked Miss Tynon to look, and that she lifted the side curtain, and then told him that the track was clear. He testified also that a little further on, four or five buggy lengths, he reached forward and looked again; that the team slowed down as they reached the incline leading to the railroad track; that he thought that the incline commenced about 70 or 80 feet from the track.

As the railroad track was elevated, and the "Good Road" was elevated, and there was also an incline still further elevated as the road approached the crossing, it would seem, according to the testimony, that there was nothing to obstruct the view of the railroad track from the buggy, and that the plaintiff and Dr. Vance should have seen the ap-

proaching train.  As the train was not considered to be due until 3 o'clock, that may have affected their alertness and vigilance.

The team appears to have been about 12 to 15 feet distant from the railroad track after it checked up and just immediately before the collision. There is testimony that it nearly stopped. Then it jumped forward. The engineer saw the team slow up. He testified that he "thought they were stopping. * * * I thought they were almost stopped. They were almost stopped. * * * I got it in my head they were stopping." Counsel for the plaintiff interrogated the witness: "Q. You thought they were going to stop? A. Yes, sir. Q. And that is why you didn't whistle? A. Yes, sir. Well, the whistling wouldn't do any good anyhow. * * * I supposed they were going to stop * * * I thought they were almost stopped. They come to a check-up; and, if they were going on the track, I thought it was no use to whistle. I went for the air." Farther along in the evidence it is shown that after the team had checked up it suddenly started forward. When asked what he then did, the engineer testified: "I throwed the air into the emergency and tried to stop." When asked why he gave the attention to the air and the emergency, he answered: "Because it was the only thing that would do any good at that time; the whistle would do no good." While we may not accurately know the distance between the engine and the buggy at that time, only a second or two could intervene between throwing on "the air and the emergency" and the collision. He testified: "I had to turn the sand on to stop it quick." Perhaps what the engineer did lessened the speed of the train sufficiently to save the lives of both occupants of the buggy. With the horses jumping for the track, it cannot be said that the engineer acted unwisely.

Shortly before the collision the engineer seems to have blown the whistle on four separate occasions. The evidence shows that the engineer blew the whistle for the crossing south of the brickyard, for the crossing north of the brickyard, and that at about half way between there and the "Good Road" crossing he whistled for Auburn, and at the

whistling post at the "Good Road" crossing he again whistled. As the road crossing whistles are each two long and two short blasts, and the station whistle is one long blast, he must have whistled much of the time. There would be four blasts for each road crossing, making twelve for road crossings, and one long blast for the station would make thirteen in all; and these blasts were all given within a mile of Auburn. The last road crossing whistle was given within a quarter of a mile of the station at Auburn. It would seem that so much whistling ought to have been heard. Then the "automatic bell" had been set to ringing. "It was working all the time since we left Atchison."

It would seem that, if the plaintiff has been negligent and her negligence places her in a place of danger, this will not warrant the defendant who finds her in such place of danger in perpetrating an unnecessary injury upon her; but if the physical facts show that she should have seen the train, and she testified that she looked out and did not see it, it must be presumed that the train was there, and that the fault of failing to see it was her fault and due to her negligence. *Erie R. Co. v. Hurlburt*, 221 Fed. 907; *Pittsburgh, C., C. & St. L. R. Co. v. Fraze*, 150 Ind. 576, 65 Am. St. Rep. 377; *Union P. R. Co. v. McDonald*, 152 U. S. 262; *Lynch v. Pennsylvania R. Co.*, 88 N. J. Law, 408.; *Pennsylvania R. Co. v. Righter*, 42 N. J. Law, 180.

In *Erie R. Co. v. Hurlburt, supra*, Judge McCall, delivering the opinion of the court, said: "It challenges human credulity to be asked to believe that Mrs. Hurlburt looked and listened, as she says that she did, and neither saw nor heard the train that smashed into her buggy and wrought such havoc. There is no evidence that tends to explain why she did not see the oncoming train. Her testimony explodes every theory upon which to predicate an explanation that would tend to excuse her. Indeed, it is so improbable that it does not afford a scintilla of evidence upon which to go to the jury. We are of opinion that it was error to refuse the company's motion for a directed verdict at the close of all the evidence."

In *Lynch v. Pennsylvania R. Co., supra,* the court said: "As has already been stated, from the point where the plaintiff says he stood when he made his observation, the view along the track in the direction from which the engine was approaching was practically unobstructed for a distance of approximately 250 feet. That the engine was still within this distance when the plaintiff made his observation is demonstrated by the fact that at once after doing so he stepped upon the track and was immediately struck. It follows, therefore, either that he was mistaken in his statement that he looked, or else that he looked in such a perfunctory manner that he was not conscious of what was immediately before his eyes. In either event he failed to use that reasonable care for his own safety which the law requires of all persons when approaching these places of known danger."

In *Hooker v. Wabash R. Co.,* 99 Neb. 13, a deaf man named Davis was walking on the track ahead of a freight train. He could talk and was able to understand what was said to him by watching the lips of the speaker. Two of his friends had warned him against the danger of walking on the railroad track, and to one of them he had replied that he "would have to keep his eyes open for that train, because he had to depend on his eyes for his ears." He was struck by the locomotive and killed. A judgment for $15,000 was awarded the administrator of his estate. On appeal this court held that the facts shown by the evidence were "not sufficient to warrant the application of the rule of 'the last clear chance.'" It also held: "Where the undisputed evidence shows that none of the train crew had any knowledge that an adult person walking upon the track was deaf, or was afflicted with any other infirmity, that the engineer used all proper signals to warn him of the approach of the train up to the instant when it appeared that he was not going to step off the track, and at that instant did everything possible to stop the train and avoid a collision, it cannot be said that the engineer carelessly ran the pedestrian down." In the body of the opinion it was said: "There was no time after Davis was discovered upon the track, up to the very

minute when he was struck by defendant's engine, that he could not have avoided the injury to himself by merely stepping off the railroad track, and we think it cannot be said that he was discovered to be in a state of peril at any point of time before the engineer used his utmost endeavor to stop the train." Many authorities were cited in support of the view that the facts were not sufficient to invoke the doctrine of "the last clear chance." Among these we refer to *Drown v. Northern O. T. Co.,* 76 Ohio St. 234; *Dyerson v. Union P. R. Co.,* 74 Kan. 528; *Green v. Los Angeles T. R. Co.,* 143 Cal. 31; *Holverson v. St. Louis & S. R. Co.,* 157 Mo. 216; *Merritt v. Foote,* 128 Mich. 367.

The case at bar does not belong to that class of cases to which the doctrine of "the last clear chance" is properly applicable. The engine was too close to the buggy and too near to the unexpected and apparently inevitable collision to enable the engineer to long reflect. He was compelled to act at once, and his impulses were in the direction of saving life by stopping the train or reducing its speed. He was successful in his efforts, for the occupants of the buggy were saved from the instant death which threatened them, although one of them was injured as the train could not be stopped at once. No one may say with certainty that the engineer, who was confronted by probable death to the persons just ahead of him, and who had a duty to perform concerning the safety of the passengers behind him, did not exercise a wise discretion. Because of the unsatisfactory character of the plaintiff's testimony, and because of the known physical facts shown to be apparent in the case, as well as because of the evidence in favor of the defendant, it would seem that there is nothing to support the doctrine of "the last clear chance."

The defendant railroad company is not liable, because there was no negligence upon the part of its engineer in charge of the train which in any way tended to bring about the plaintiff's injury. He had the whistle give thirteen blasts in the distance of a mile, which was probably traveled in a little more than two minutes immediately preceding the accident. He had the whistle give four blasts for the

"Good Road" crossing, and when the last blast was given the engine could not.have been far from the crossing itself where the accident happened, as the whistling posts were placed only a quarter of a mile from each crossing, and, while the four blasts were being given, the train, as shown by the evidence, would run its length toward the crossing. He had a right to believe that the two persons in the buggy had seen and heard the train, and knew that it was approaching and that it was close to the buggy, and he also had a right to believe that the buggy was about to stop. This belief was justified, because the buggy nearly stopped within a few feet of the track, and up to the time that the horses suddenly sprang forward, as if to cross the track, he had no reason to suppose that the buggy was going upon the track. It cannot, therefore, be said that plaintiff "was discovered to be in a state of peril at any point of time before the engineer used his utmost endeavors to stop the train."

The plaintiff has failed to establish her case, because her conduct could not reasonably be anticipated by the engineer of the train, and her injury appears to be due to her own negligent action, and not to any act of the defendant or its railway engineer.

REVERSED AND REMANDED.

ROSE and SEDGWICK, JJ., not sitting.